## GUNN v. BARRY.

AN exemption law of Georgia, passed several years ago, exempted from execution in favor of each head of a family, "fifty acres of land, and five additional ones for each of his children under the age of 16 years, the land to include the dwelling-house and improvements if the same do not exceed $200," and exempted many other things, chiefly household furniture, wearing apparel, books, family portraits, &c.; the value of which was not limited, and which might vary with different debtors and their families. With that law in force A. obtained a judgment for $531 against B., who had 272½ acres of land, worth $1300, and had no other property but land worth $100, from which the judgment could be satisfied. In this state of things Georgia having passed an "ordinance of secession," withdrew her senators and representatives from the Congress of the United States, and went into the rebellion. The rebellion being suppressed, but Georgia not being allowed by Congress yet to send senators and representatives to its sessions, Congress passed what was known as the Reconstruction Act. This act reciting that "no legal State government or adequate protection for life or property now existed in the rebel State of Georgia," authorized the said State to make a constitution, which being submitted to Congress and approved by it, the State was to be entitled to representation. The people of the State did accordingly make a new constitution and submit it to Congress. This new constitution provided that "each head of a family should be entitled to a homestead of realty to the value of $2000 in specie, and personal property to the value of $1000 in specie, to be valued at the time they are set apart;" and ordained further that—

    "No court or ministerial officer in the State shall ever have jurisdiction or

authority to enforce any judgment, decree, or execution against said property so set apart, including such improvement as may be made thereon from time to time, except for taxes, money borrowed or expended in the improvement of the homestead, or for the purchase-money of the same, and for labor done thereon, or material furnished therefor, or removal of incumbrances thereon."

The constitution with this exemption and these provisions in it was submitted to Congress, which approved part of it and disapproved of other parts; enacting only that after certain changes were made the State should be entitled to representation. No objection was made to the clauses of exemption or the provisions above quoted. The State of Georgia complied with the requirements of Congress, and a constitution satisfactory to that body being made—these clauses of exemption and the accompanying provisions, being in it—the State was declared entitled to representation. *Held,*

1st. That as respected a creditor who had obtained by his judgment a lien on the land which the old exemption secured to him while the new one destroyed it, the law creating the new exemption impaired the obligation of a contract, and was unconstitutional and void.

2d. That the fact that the constitution had been made under the special circumstances and in the special way above mentioned, and under the eye of Congress, did not change the case.

ERROR to the Supreme Court of Georgia; the case being thus:

By a statute of Georgia, passed many years ago, it was enacted that the following property, belonging to a debtor who was the head of a family, should be exempt from levy and sale.

"Fifty acres of land, and five additional ones for each of his children under the age of 16 years, the land to include the dwelling-house, if the same and improvements do not exceed $200.

"One farm horse or mule.

"One cow and calf.

"Ten head of hogs.

"Fifty dollars' worth of provision, and *five dollars' worth for each additional child.*

"Beds, bedding, and *common,* bedsteads sufficient for the family..

"One loom, one spinning-wheel, two pair of cards, and one hundred pounds of lint cotton.

"*Common* tools of trade for himself and his wife.

" Equipments and arms of a militia soldier and trooper's horse.

" *Ordinary* cooking utensils and table crockery.

" Wearing apparel of himself and family.

" Family Bible.

" *Religious works* and school books.

" *Family portraits.*

" The library of a professional man not exceeding $300 in value, to be selected by himself."

In 1861, with this statute in existence, the State of Georgia passed what was called " an ordinance of secession " from the United States; and joined in the treason and rebellion against the Federal government into which the slaveholding States, for the most part, entered.  Her senators and representatives withdrew from Congress; her State government passed into the hands of persons at war with the United States; and she became one of the States styled " The Confederate States of America;" a confederacy which waged war for several years on the government, and whose insurrection and rebellion the government, on the other hand, sought by force of arms to suppress.  The arms of the United States having proved triumphant, the so-called government of the Confederate States fell to pieces, and the State of Georgia was left where she had put herself, that is to say, in the hands of traitors and rebels.  No senators or representatives were allowed by the Congress of the United States to come back to its chambers as of old.

In this state of things, in May, 1866, Gunn obtained judgment in one of the courts of the State for $402.30 principal, and $129.60 interest (in all $531.90), against a certain Hart. For what the judgment had been obtained did not appear. Hart had at this time 272½ acres of land, worth $1300, and the judgment bound it as a lien.  He had no other land but one piece worth about $100.

On the 2d of March, 1867, the rebellion being suppressed, but the ancient relation of Georgia to the General Government, being still, in point of fact, not restored by representation, the Congress of the United States passed " an act to

provide for the more efficient government of the rebel States;" the act commonly called the Reconstruction Act.* This act—reciting that "no legal State governments or adequate protection for life or property now existed in the rebel States of Virginia, *Georgia*, North Carolina," &c., and that it was "necessary that peace and good order should be enforced in the said State till loyal republican State governments could be legally established," and putting these said States under military rule—enacted that when the people of any one of the said rebel States should have formed a constitution of government in conformity with the Constitution of the United States in all respects . . . and "*when such constitution shall have been submitted to Congress for examination and approval, and Congress shall have approved the same . . . &c., said State shall be declared entitled to representation in Congress, and senators and representatives shall be admitted therefrom.*"

In pursuance of what was contemplated by this act, and of certain amendments to it, the people of Georgia did make a constitution. This constitution by the first section of its seventh article ordained that—

"Each head of a family, or guardian, or trustee of a family, of minor children shall be entitled to a homestead of realty to the value of $2000 in specie, and personal property to the value of $1000 in specie, to be valued at the time they are set apart."

It went on further to declare:

"And no court or ministerial officer in this State shall ever have jurisdiction or authority to enforce any judgment, decree, or execution against said property so set apart, including such improvement as may be made thereon from time to time, except for taxes, money borrowed or expended in the improvement of the homestead, or for the purchase-money of the same, and for labor done thereon, or material furnished therefor, or removal of incumbrances thereon."

The constitution having been thus adopted in form by the people of Georgia, was sent with this article included to the Congress of the United States, which by an act of June

---

* 14 Stat. at Large, 428.

25th, 1868,* " to admit the States of Georgia, &c., to representation in Congress," reciting that whereas the people of Georgia, North Carolina, &c., had in pursuance of the already quoted act of March 2d, 1867, "framed constitutions of State government which are republican, and have adopted said constitutions," enacted that each of the States of North Carolina, *Georgia,* &c., shall be entitled and admitted to representation in Congress as a State of the Union when the legislature of such State shall have duly ratified the amendment to the Constitution of the United States . . . known as "Article Fourteen :" *Provided,* That the State of Georgia shall only be entitled and admitted to representation upon this further fundamental condition, that the first and third subdivisions of section seventeen of the fifth article of the constitution of said State except, &c., shall be null and void, and that the General Assembly of said State by solemn public act shall declare the assent of the State to the foregoing provision.

The State having afterwards ratified the fourteenth amendment, and complied with other requirements, was by an act of Congress, passed July 15th, 1870,† declared entitled to representation in Congress.

The constitution of Georgia being thus approved by Congress, and operative, the legislature of Georgia, on the 3d of October, 1868, passed

"An act to provide for setting apart a homestead of realty and personalty and for the valuation of said property, and for the full and complete protection and security of the same to the sole use and benefit of families, as required by section first of article seventh of the constitution and for other purposes."

The language of this act was the same as the provision of the constitution. Under the act all the land of Hart, which altogether, it will have been observed, was worth about $1400, was set apart to him and his family as a homestead.

On a requirement by Gunn, to the sheriff of the county, one Barry, that he should levy on the 277½ acres, Barry re-

.* 15 Stat. at Large, 73.                    † 16 Id. 363.

fused to do so, upon the ground that they had been set off to Hart and his family under the act of 1868, and on a petition for mandamus against Barry to compel him to make the levy, the courts of Georgia, including the Supreme Court, having decided that the refusal of the sheriff was right, the case was brought here.

The question involved was of course the constitutionality as against Gunn, who had got his judgment before its passage, of the new exemption.

*Mr. P. Phillips, for the plaintiff in error:*

Hart having had 272½ acres of land, worth $1300, of which land 50 acres, or at very most, say a half, was exempt under the old law, obtained a judgment for $531.90. His debt is thus perfectly secure. He has an interest in the land to the extent of the judgment; an interest which binds it in the hands of the debtor and to whomsoever the debtor may transfer it. Then comes the new constitution and law, which withdraws the whole of the land from the lien, and for all practical purposes dissolves or destroys the lien. The remedy, which was before complete, is now annihilated. And the creditor who, before, would have been paid in full, is deprived of getting anything. If this is not impairing the obligation of a contract—if it is not destroying vested rights—what is?

There was, no doubt, great inducement in the Southern States, arising out of the disasters of the war, to legislation in favor of debtors. But while much may be said in extenuation of such legislation, nothing, when it is like that here, can be judicially said in justification of it. In Arkansas an exemption of $7000 has been made. In Mississippi of $4000. In other Southern States exemptions more or less large. With the operation of these exemptions on contracts made subsequently to them, we do not deal. But when applied to contracts made when no such exemptions were allowed or thought of, the illegality is obvious.

Some singular results follow as respects the State of Georgia. The population of the State is estimated at

1,500,000. Under the new exemption every head of a family is entitled to $2000 in land. Assuming that five persons constitute a family, we have 300,000 heads of families; and if each "head" obtained the $2000 in land, the law appropriates land to the amount of $600,000,000. *This is three times more than all the land in the State is estimated at.*

*No counsel appeared on the other side ;* but the court was referred to arguments made in Georgia, where the validity of the laws making the new exemption had been sought to be maintained. So far as the reporter understood them, the grounds were somewhat thus :

The old law, so far as it operated on contracts made after its date, was confessedly valid. Practically from the time of its passage no court or ministerial officer of the State had jurisdiction or authority to enforce any judgment, decree, or execution against property set aside under *it.*

The old law being valid, what made the exemption of 1868 invalid? It was not invalid.

I. In *Von Hoffman* v. *Quincy,*[*] this court said :

"It is competent for the States to change the *form* of the remedy or to *modify* it otherwise as they may see fit, provided no *substantial* right secured by the contract is thereby impaired. No attempt has been made to fix definitely the line between alterations of the remedy which are deemed legitimate and those which under the form of modifying the remedy impair substantial rights. *Every case must be determined upon its own circumstances.*"

So, in that same case, this court referring to an observation made in an earlier case—that " one of the tests that a contract has been impaired is that its value has by legislation been diminished "—say :[†]

" This has reference to legislation which affects the contract *directly, and not incidentally or only by consequence.* The right to imprison for debt is not a part of the contract. It is regarded as penal rather than remedial. The States may abolish it *whenever*

---

[*] 4 Wallace, 553.            [†] Page 553.

*they think proper.* They may *also* exempt from sale under execution the necessary implements of agriculture, the tools of a mechanic, and articles of necessity in household furniture. It is said,* 'regulations of this description have always been considered in every civilized community as properly belonging to the remedy to be exercised by every sovereignty *according to its own views of policy and humanity.*'"

This court, then, here admitted that though a contract was in existence the legislature might legislate upon it so as to *diminish* its value provided the legislation were indirect. And the very sort of legislation which was in question in this case is given as an illustration of the means through which a diminution, lawful in character, may be made. The reason of the lawfulness, though the legislation be retroactive, was also plainly adumbrated. It was that the principles of humanity having in all civilized countries, time out of mind, induced legislatures to intervene between the creditor and his debtor to prevent the former from stripping the latter and his family of those articles which are necessary to their existence, and this sort of legislation being exercised by every sovereign "according to his own views of policy and humanity," every person entering into a. contract enters into it with a full recognition of the right of the legislature to act on the subject according to such, its own views—views which, of course, must vary according to times and exigencies.

Hence, if the right of the legislature was legitimately exercised; if, in other words, the particular law did not transcend the limits of fair legislation, the "obligation of contracts" was not impaired even though the legislation were retroactive, and though by a change in the character of the articles exempted the remedy might, in particular cases, be less visibly efficacious, as in others it might be more so.

Now, was the argument this, to wit, that the act of 1868 is unlawful because abstractly and in itself considered it

* Beers v. Houghton, 9 Peters, 359; Ogden *v.* Saunders, 12 Wheaton, 230; Mason *v.* Haile, 12 Id. 273; Sturges *v.* Crownenshield, 4 Id. 200.

made an exemption too great in amount? That fact was denied. An exemption of a house and lot worth $2000, and of personalty worth $1000, was not so plainly an excessive exemption as to be certainly void; void whether considered prospectively or retrospectively. Such a thing cannot be affirmed; the legislature of Georgia having had a right within fair limits to act according to "its own views of policy and humanity."

Then, was it void because by it a greater amount was exempted than by the former act? If the fact were so, still, if the increase were made by the legislature of the State in a fair exercise of the legislature's "views of humanity and policy," it would be hard to say, under the language of this court above quoted from *Von Hoffman* v. *City of Quincy*, that from this cause merely—the increase not being really great —it was void *in toto*. But the increase in the magnitude of the exemption was denied by the argument in Georgia. On the contrary, looking at the number of items exempted under the old law, and their character, it was asserted that in some cases of land in some families the exemption would be much less. A homestead of at least 50 acres, *worth any sum*, and if a man had ten children, of 100 acres, was exempted. Then the "bedsteads," "tools," and "cooking utensils" exempted must all be "common" or "ordinary." But nothing else was so required to be. *All* wearing apparel of the debtor and of all his family—however numerous the family or valuable the apparel—was exempted; so would a theological library be, however extensive and valuable, and family portraits which, if by certain artists, would have great value. In a case where the 50 acres were near a city, or where the family was of any quality and with members at all numerous, the articles exempted by the old law could hardly fail far to exceed $3000 in value. The new provision was but an equalization to all the people of the State of what was meant to be given by the old law, but was not really given.

II. Then was the case affected by the fact that the constitution and statute changing the character of the exemption

declare that no court or ministerial officer in the State shall ever have authority to enforce any judgment, decree, or execution against said property so set apart? &c. How did that affect the matter? Under the old exemption no court or ministerial officer of the State could ever have had jurisdiction or authority to enforce any judgment, decree, or execution against the property set apart. Assuming that the exemption itself was valid, any prohibition by words was useless, and any words of prohibition were but surplusage. The prohibition followed from the validity of the exemption, and followed as much without words of prohibition as with them.

The case, then, was this. The legislature acting on "its own views of policy and humanity" has so far modified an old exemption that, instead of some real estate, the value of which varied and might be worth much more than $2000, and a great number of articles of personalty *nominatim*, whose value also varied and which, of themselves, might be worth much more than $1000, and might be found in some families and not at all in others; now exempts realty worth $2000 and personalty worth $1000; so as to make the law operate for all as equally and equitably as possible. Is the legislative power constitutionally incapable of making such a change?

Then it could not be contended that by the mere contract, whatever it was, on which this judgment had been obtained, any *lien* was acquired. The new constitution withdrew nothing from the operation of the *contract*. And though a lien was acquired by the *judgment*, yet, if the new exemption did withdraw the land from the operation of *it*, the obligation of no *contract* was impaired.

But the strongest view, it was said, remained. In 1865 a revolution had swept over the land. The old State government had gone to wreck. The people had no civil government, and were in anarchy. The Congress of the United States invited them to make a government, and undertook to guarantee to the State one of a republican form. The constitution of 1868 was the result. It was made through

the power and agency of Congress, under *its* law and under its eye. It was more the work of Congress than of the State. Congress insisted that a portion of the proposed constitution, which it disliked, should be fundamentally rejected; and that place should be given to new propositions which it thought good. The people of the State wanted neither change. But all that Congress prescribed to be done was done. Congress then assented that the instrument should go into effect, and it is in virtue of that assent that it did go into effect. The constitution of Georgia is, therefore, an act of Congress, and it has, accordingly, all the validity of such an act. Now there is no doubt that Congress may if it please pass a law impairing the obligation of contracts,* though the States may not.

Mr. Justice SWAYNE delivered the opinion of the court.

On the 12th of May, 1866, the plaintiff in error recovered in the Superior Court of Randolph County a judgment against W. R. Hart for the sum of $402.30 principal, and $129.60 interest up to the date of the judgment, and costs. An execution was issued upon the judgment, and placed in the hands of the defendant in error as sheriff of that county. He was thereby commanded to make the sums above mentioned and further interest upon the principal from the 12th of May, 1866, and the costs. The plaintiff in error requested him to levy upon a tract of land of 272½ acres, belonging to Hart, the defendant in the judgment. Barry refused. He assigned as the only reason for his refusal that the premises had been set off to Hart under the provisions of the act passed by the General Assembly of the State, and approved October 3d, 1869, entitled "An act to provide for setting apart a homestead of realty and personalty, and for the valuation of said property, and for the full and complete protection and security of the same to the sole use and benefit of families, as required by section first of article seventh of the constitution, and for other purposes."

---

* Evans *v.* Eaton, Peters's Circuit Court, 322.

Gunn thereupon petitioned the Superior Court of the county, for a writ of mandamus to compel the sheriff to make the levy. The petition set forth that the land in question was the only property known to him subject to the lien of his judgment, except a tract of 28 acres of the value of $100, situated in the county of Stuart, which was also included in the homestead so set apart; that the premises in question were worth the sum of $1300, and that they embraced a much larger number of acres than the real estate exempt from levy and sale by the laws in force when the judgment was recovered and when the debt on which it was founded was contracted. It does not appear that these allegations were denied, and we do not understand that there is any controversy upon the subject. After a full hearing the court affirmed the validity of the act in its retrospective aspect, and gave judgment against the petitioner. The Supreme Court of the State affirmed this judgment.

The first section of the seventh article of the constitution of Georgia of 1868 provides that " each head of a family, or guardian or trustee of a family of minor children, shall be entitled to a homestead of realty to the value of $2000 in specie, and personal property to the value of $1000 in specie, to be valued at the time they are set apart, and no court or ministerial officer in this State shall ever have jurisdiction or authority to enforce any judgment, decree, or execution against said property so set apart, including such improvement as may be made thereon from time to time, except for taxes, money borrowed or expended in the improvement of the homestead, or for the purchase-money of the same, and for labor done thereon, or material furnished therefor, or removal of incumbrances thereon."

The first section of the act of the 3d October, 1868, is in the same terms.

It may well be doubted whether both these provisions were not intended to be wholly prospective in their effect. But as we understand the Supreme Court of the State has come to a different conclusion, we shall not consider the question.

The statute in force when the judgment was rendered declared that the following property belonging to a debtor who was the head of a family should be exempt from levy and sale (to wit): "Fifty acres of land and five additional ones for each of his children under the age of sixteen years, the land to include the dwelling-house, if the same and improvements do not exceed two hundred dollars; one farm horse or mule, one cow and calf, ten head of hogs, and fifty dollars' worth of provisions, and five dollars' worth additional for each child; beds, bedding, and common bedsteads sufficient for the family; one loom, one spinning-wheel, and two pairs of cards, and one hundred pounds of lint cotton; common tools of trade for himself and his wife; equipments and arms of a militia soldier and trooper's horse; ordinary cooking utensils and table crockery; wearing apparel of himself and family; family Bible, religious works and school books; family portraits; the library of a professional man in actual practice or business, not exceeding three hundred dollars in value, to be selected by himself."

No one can cast his eyes over the former and later exemptions, without being struck by the greatly increased magnitude of the latter.

Section 10 of Article 1 of the Constitution of the United States declares that "no State shall pass any law impairing the *obligation* of contracts."

If the remedy is a part of the obligation of the contract, a clearer case of impairment can hardly occur than is presented in the record before us. The effect of the act in question, under the circumstances of this judgment, does not indeed merely impair, it annihilates the remedy. There is none left.

But the act reaches still further. It withdraws the land from the lien of the judgment, and thus destroys a vested right of property which the creditor had acquired in the pursuit of the remedy to which he was entitled by the law as it stood when the judgment was recovered. It is in effect taking one person's property and giving it to another with-

out compensation. This is contrary to reason and justice, and to the fundamental principles of the social compact.* But we must confine ourselves to the constitutional aspect of the case. A few further remarks will be sufficient to dispose of it. It involves no question which has not been more than once fully considered by this court.

Georgia, since she came into the Union as one of the original thirteen States, has never been a State out of the Union. Her constitutional rights were, for a time, necessarily put in abeyance, but her constitutional disabilities and obligations were in nowise affected by her rebellion. The same view is to be taken of the provision in her organic law and of the statute in question, as if she had been in full communion with her sister States when she gave them being. Though her constitution was sanctioned by Congress, this provision can in no sense be considered an act of that body. The sanction was only permissive as a part of the process of her rehabilitation, and involved nothing affirmative or negative beyond that event. If it were express and unequivocal, the result would be the same. Congress cannot, by authorization or ratification, give the slightest effect to a State law or constitution in conflict with the Constitution of the United States. That instrument is above and beyond the power of Congress and the States, and is alike obligatory upon both. A State can no more impair an existing contract by a constitutional provision, than by a legislative act; both are within the prohibition of the National Constitution.

The legal remedies for the enforcement of a contract, which belong to it at the time and place where it is made, are a part of its obligation. A State may change them, provided the change involve no impairment of a substantial right. If the provision of the constitution, or the legislative act of a State, fall within the category last mentioned, they are to that extent utterly void. They are, for all the purposes of the contract which they impair, as if they had never existed. The constitutional provision and statute

* Calder v. Bull, 3 Dallas, 388.

here in question, are clearly within that category, and are, therefore, void. The jurisdictional prohibition which they contain with respect to the courts of the State, can, therefore, form no impediment to the plaintiff in error in the enforcement of his rights touching this judgment, as those rights are recognized by this court.*

THE JUDGMENT IS REVERSED, and the cause will be remanded to the Supreme Court of Georgia with directions to enter a judgment of reversal, to reverse the judgment of the Superior Court of Randolph County, and thereafter to proceed

IN CONFORMITY TO THIS OPINION.

---

* White *v.* Hart, 13 Wallace, 646; Von Hoffman *v.* The City of Quincy, 4 Id. 535.