WILSON BANKING CO. LIQUIDATING CORPORATION *et al. v.* COLVARD.

(In Banc. April 22, 1935.)

[161 So. 123. No. 31602.]

Ward Allen, of Greenwood, for appellant.

H. C. Mounger, of Greenwood, for appellee.

808

Argued orally by **Ward Allen**, for appellant, and by **H. C. Mounger**, for appellee.

**Cook, J.,** delivered the opinion of the court.

Appellee, M. W. Colvard, is the owner of a lot and building located on one of the principal business streets of the city of Greenwood, Miss., in a part of which he conducts a baking business. At the time of the trial of this cause in the court below that part of the building which was not occupied and used by the owner was rented at a monthly rental of fifty dollars, and the value of the lot and building was estimated by different witnesses at from forty thousand to sixty thousand dollars. During the year 1928 the appellee borrowed from the Wilson Banking Company the sum of twenty-six thousand seven hundred fifty dollars, and executed a deed of trust on said lot and building to secure the payment

of this indebtedness. He met the payments on this indebtedness promptly until after the Wilson Banking Company closed its doors in 1930, and was placed in the hands of the state banking department for liquidation. Shortly after the Wilson Banking Company closed for liquidation, four of the five remaining banks in Greenwood failed. Since 1930 the appellee has made some small payments on his indebtedness to the Wilson Banking Company, which reduced the principal thereof to about seventeen thousand dollars, and he has paid the taxes and insurance on the mortgaged property, which amount to about one thousand three hundred dollars annually.

In May, 1934, the Wilson Banking Company Liquidating Corporation, one of the appellants herein, was organized, and it took over from the state banking department the assets of the closed Wilson Banking Company, including the note and deed of trust executed by the appellee; and thereafter the property covered by this deed of trust was advertised for sale to satisfy the balance due on the indebtedness. Thereupon, the appellee filed a bill in the chancery court of Leflore county alleging that his failure to pay the indebtedness was due to the distressed business condition, and failure of banks in that territory; that a sale of property under the then existing business conditions would prevent fair, open, and competitive bidding, and would result in a loss to him of said property; that he was unable to refinance the indebtedness under the existing federal regulations or agencies or otherwise, and that, in so far as he was able, he was ready and willing to comply with any and all requirements of the court in the premises; and praying that the sale be enjoined as authorized by the provisions of chapter 247, Laws 1934.

Upon the filing of this bill an injunction was issued, and promptly thereafter appellant Liquidating Corpora-

tion filed a motion to dissolve, accompanied by an answer denying the averments of the bill stated above, and challenging the constitutionality of the said chapter 247, Laws 1934, on the ground that no such extreme public economic emergency existed at the time said chapter was adopted, or at the time the bill was filed, as would justify the enactment or continued validity of a law impairing the obligation of contracts, and denying due process and the equal protection of the laws.

Upon the hearing of the motion to dissolve the injunction much testimony was offered bearing upon the business and economic conditions existing in the Mississippi Delta, and throughout the state and nation, at the time of the enactment of this statute in April, 1934, and at the time the bill of complaint was filed in October, 1934. At the close of this hearing the court below entered a decree overruling the motion to dissolve the injunction, which in effect sustained the validity of the said act, and the proceedings thereunder, and granted an appeal to settle the controlling principles involved.

Chapter 247, Laws 1934, was approved by the Governor on April 4, 1934, and expires, except as to cases then pending in Court, on May 1, 1936, and expressly provides that no postponement of sale shall be ordered or allowed thereunder which will have the effect of extending the period for redemption beyond May 1, 1936. The act provides that proceedings thereunder for the stay of foreclosures of mortgages and deeds of trust shall be deemed ready for final hearing at any time after the expiration of thirty days from the completion of service of summons on all parties, and that on the hearing the court, or chancellor in vacation, shall receive evidence to establish the reasonable normal actual value of the mortgaged property, and may fix an upset price thereon, and shall determine the reasonable value of the income on said property, or, if it has no income, then the reason-

able rental value, and, in lieu of a present order of sale, shall direct and require the mortgagor, or those interested through or under him, to pay all or a reasonable part of said income or rental value in or toward the payment of taxes, insurance, and interest on the mortgage indebtedness, together with a reasonable sum for the upkeep of the property, such payments to be made at such times and in such manner as shall be determined by the court or chancellor to be just and equitable, for a term not to exceed two years. It is further provided that if default be made in the payment of the fixed carrying charge payments, or any waste is committed on the property covered by the mortgage or deed of trust, the right to further postponement of a final sale shall terminate thirty days, after such default, and the mortgagee or trustee or other persons having the right to foreclose shall thereupon be entitled to a final decree of sale upon a satisfactory showing to the court that such default has occurred.

The act further provides (section 5) that at any time after the final hearing provided for in section 4 thereof, the chancellor shall have the power in vacation, after notice to all the parties, to make any necessary order or decree in respect to any matter that shall arise under the act, and that the court or chancellor in vacation shall have the power to revoke the period of extension theretofore granted for the making of a final order of sale, in case it is made to appear that the occasion for the said postponement no longer exists, or is no longer just and reasonable. In general, the court or chancellor in vacation is granted the power to alter or revise any order theretofore made to meet changed circumstances and conditions. By section 15 of the act it is provided that, "No postponement or extension shall be ordered under conditions which, under the temporary emergency, would substantially diminish or impair the value of the con-

tract or obligation of the person against whom the relief is sought, without reasonable allowance to justify the exercise of the police power hereby authorized.''

The legislative declaration as to the existence of such public economic emergency as would justify the enactment of the statute is set forth in a preamble thereto which reads, in part (section 1), as follows:

''Be it enacted by the Legislature of the State of Mississippi, That Whereas, the severe financial and economic depression existing for several years past has resulted in extremely low prices for the products of the farms and the factories, a great amount of unemployment, an almost complete lack of credit for farmers, business men and property owners and a general and extreme stagnation of business, agriculture and industry, and

''Whereas, many owners of real property, by reason of said conditions, are unable, and it is believed, will for some time be unable to meet all payments as they come due of taxes, interest and principal of mortgages and deeds of trust on their properties and are, therefore, threatened with loss of such properties through mortgage foreclosure and judicial sales thereof, and

''Whereas, many such properties have been and are being bid in at mortgage foreclosure and execution sales for prices much below what is believed to be their real values and often for much less than the mortgage or judgment indebtedness, thus entailing deficiency judgments against the mortgage and judgment debtors, and

''Whereas, it is believed, and the legislature of Mississippi hereby declares its belief, that the conditions existing as hereinbefore set forth have created an emergency of such nature that justifies and validates legislation for the granting of time of redemption from mortgage foreclosure and execution sales and other relief of a like character, and

"Whereas, the state of Mississippi possesses the right under its police power to declare a state of emergency to exist, and

"Whereas, the inherent and fundamental purpose of our government is to safeguard the public and promote the general welfare of the people, and

"Whereas, under existing conditions the foreclosure of many real estate mortgages by advertisement would prevent fair, open and competitive bidding at the time of sale in the manner now contemplated by law, and

"Whereas, it is believed, and the legislature of Mississippi hereby declares its belief, that the conditions existing as hereinbefore set forth have created an emergency of such a nature that justifies and validates changes in legislation providing for the temporary manner, method, terms and conditions upon which mortgage and deed of trust foreclosure sales may be had or postponed and jurisdiction to administer equitable relief in connection therewith may be conferred upon the chancery court, and

"Sec. 2. In view of the situation hereinbefore set forth, the legislature of the state of Mississippi hereby declares that a public economic emergency does exist in the state of Mississippi."

The right of a state, in the exercise of its police power, to give temporary relief from the enforcement of contracts when an urgent public need produced by economic causes demands such relief, provided the relief afforded is of a character appropriate to the emergency and is granted upon reasonable conditions, is established by the decision of the Supreme Court of the United States in the case of Home Building & Loan Ass'n v. Blaisdell, 290 U. S. 398, 54 S. Ct. 231, 78 L. Ed. 413, 88 A. L. R. 1481. And that it is always open to judicial inquiry whether the emergency still exists upon which the continued operation of such a law depends, was settled in

the case of Chastleton Corp. v. Sinclair, 264 U. S. 543, 44 S. Ct. 405, 68 L. Ed. 841.

In determining whether the said act of 1934 contravenes the contract clause of the federal Constitution, the first question for consideration is whether or not it is a reasonable exercise of the police power of the state; or, in other words, whether the relief afforded thereby is of a character appropriate to the existing emergency and is granted upon reasonable conditions.

Conceding that the act, in some measure, temporarily impairs the obligations of the mortgage contract, still we do not think it goes beyond what is reasonably necessary to give relief in the emergency found by the Legislature to exist and to justify and require relief. The act is temporary in operation, and expires by limitation on May 1, 1936. The right to foreclose remains, and upon the hearing of a cause seeking to postpone a foreclosure, the court may determine the reasonable normal actual value of the mortgaged property, fix an upset price thereon, and permit the sale to proceed. And if the sale is postponed during the operation of the law, the court must determine the reasonable value of the income on said property, or the reasonable rental value thereon, and shall require the mortgagor to pay all or a reasonable part of said income or rental value toward the upkeep of the property, and in payment of taxes, insurance, and interest on the mortgage debt; and if default is made in these required payments, or if any waste is committed on the property, the right to further postponement is terminated within thirty days after such default, and the court may then, in term time or in vacation, order a sale of the property. The power is granted to the court or chancellor in vacation to revoke any extension or postponement whenever it is made to appear that the occasion for such postponement no longer exists, or that it is no longer just and reasonable, and also to

alter or revise the orders theretofore made in any respect required by changed conditions or circumstances, and during the pendency of the matter in court the statute of limitations is suspended. In its provisions for the protection and preservation of the rights of the mortgagee, the act here involved certainly appears to be as full and comprehensive as that of the Minnesota law, the validity of which was upheld in the Blaisdell Case, supra.

The next question that arises is whether or not, at the time of the enactment of chapter 247, Laws 1934, there existed in this state such an urgent economic emergency as justified its passage, and if so, whether at the time of the issuance of the injunction in this cause such an exigency still existed.

The legislative declaration of the existence of a serious public emergency, and its recitals of the conditions in this state in April, 1934, are entitled to great weight. As said by the Supreme Court of Minnesota in the case of Blaisdell v. Home Building & Loan Ass'n, 189 Minn. 422, 249 N. W. 334, 337, 86 A. L. R. 1507, ''The members of the Legislature come from every community of the state and from all the walks of life. They are familiar with conditions generally in every calling, occupation, profession, and business in the state. Not only they, but the courts must be guided by what is common knowledge.'' It is common knowledge that during the several years immediately preceding the enactment of this statute in 1934, land values in this state, and particularly in the Mississippi Delta, had shrunk enormously, and loans made on the basis of values existing several years before could not be refinanced on the basis of values then existing. When this law was passed, the large financial companies, including insurance companies which had formerly loaned extensively on real estate in this state, had withdrawn from that field of activity. Many of the

banks, including five out of six in the city of Greenwood, had failed. None of the banks would lend on real estate mortgages, and all of them were rapidly reducing their assets to a more liquid form by investing heavily in federal, state, and municipal securities. In an effort to save the homes of distressed debtors throughout the country the Congress had established agencies and provided funds whereby mortgages on their homes might be refinanced, and during the year 1934, the federal government poured many millions of dollars into this state for the relief of the needy and distressed, and to provide employment for the unemployed.

The Congress has recently appropriated hundreds of millions of dollars for direct relief, and billions intended to provide employment for people who are not able to secure gainful employment in private industry. It is also common knowledge that movements have recently been in progress in many municipalities and communities in this state to raise funds by private subscriptions to supplement governmental fund provided for direct relief; that many counties and municipalities have announced their inability to provide for their needy without government aid, and that there is now in prospect an early extraordinary session of the state Legislature to make appropriations to supplement funds provided by the federal government for relief in this state during the year 1935.

It is undoubtedly true, as the evidence in this case tended to show, that at the time this act was passed in April, 1934, the price of farm products had advanced, and business conditions in this state had materially improved over those existing during the four years immediately preceding, but we cannot say from our knowledge of conditions, or from the evidence in this record, that the Legislature had no basis in fact for its conclusion that an economic emergency then existed which

called for the exercise of the police power to grant relief. Nor can we say from our knowledge of conditions, or from the evidence offered on the hearing in this cause, that during the six months intervening between the passage of this act and the filing of the bill of complaint herein, there had been any such change in economic conditions in this state as would warrant us in holding that the exigency had passed, and thereby caused the act to become an unconstitutional exercise of power. Consequently, we conclude that neither at the time of its enactment, nor at the time of the issuance of the injunction herein, was the act in question violative of the contract clause of the federal Constitution.

It is also contended that the said chapter 247, Laws 1934, violates section 16 of the state Constitution of 1890, which provides that, "Laws impairing the obligation of contracts, shall not be passed." We fully recognize the fact that decisions of the Supreme Court of the United States construing provisions of the federal Constitution are not binding on a state court in construing similar provisions of its own state Constitution. But we will not adopt the anomalous view that an act which does not contravene the contract clause of the federal Constitution (article 1, section 10, clause 1) does violate an identical provision of our own Constitution, unless we are compelled to do so by reason of prior decisions of this court construing such provision.

We have found only one case in our decisions which, in our opinion, bears any reasonable analogy to the case at bar, and that is the case of Coffman v. Bank of Kentucky, 40 Miss. 29, 90 Am. Dec. 311. In that case an act of the Legislature passed on December 1, 1865, entitled, "An act to modify the collection laws of this State," was held to violate the contract clause of our state Constitution, and also article 1, section 14 of the Constitution of 1832 (section 24, Const. 1890), which requires that,

"All courts shall be open; and every person for an injury done him in his lands, goods, person, or reputation, shall have remedy by due course of law, and right and justice shall be administered without sale, denial, or delay." In support of the view that the said act of 1865 violated the contract clauses of the state and federal Constitutions the court cited and relied largely on the cases of Bronson v. Kinzie, 1 How. 311, 11 L. Ed. 143, and McCracken v. Hayward, 2 How. 608, 11 L. Ed. 397. In the recent case of Building & Loan Ass'n v. Blaisdell, supra, the provisions of the statutes involved in Bronson v. Kinzie, McCracken v. Hayward, supra, and similar cases, which distinguish them from the Blaisdell Case, were pointed out, and it was held, that in view of the conditions with which the Minnesota statute safeguards the interests of the mortgagee during the extended period, those cases were not applicable or controlling in determining the validity of that law. For the same reasons those cases are not applicable or controlling in passing upon the validity of chapter 247, Laws 1934.

The distinction between the act involved in the case at bar and the said act of 1865 is manifest upon a mere reading of the latter act. It provided, "that all laws for the collection of debts on bonds, promissory notes, bills of exchange, open accounts, or other contract or liability for the payment of money, are hereby suspended until the first day of January, 1868, or until otherwise ordered by law, except in cases of official liabilities," and except such parts of debts due wards as the probate court, having jurisdiction of the same, might determine to be necessary for the support and education of such wards. Thereby all right to enforce debts, or liabilities for the payment of money, of every kind and character, except official liabilities, and a limited amount due wards, was attempted to be wholly terminated for a period of more than two years, and as to all rights of the citizen touch-

ing contractual liabilities for the payment of money, the doors of the court were attempted to be entirely closed. For the rights and remedies thereby withdrawn no others were substituted, but debtors were relieved of all contractual liabilities, except such as they voluntarily recognized and assumed during the period of suspension. No conditions, reasonable or otherwise, were attached to the suspension of debts. The suspension was not limited to debts secured by liens on real estate that might be unnecessarily sacrificed by foreclosure under the existing distressed conditions, and during the period of suspension the debtor was entirely relieved of all enforceable contractual obligations. Such provisions were properly held to be an unwarranted and unreasonable exercise of the police power. Such, however, is not the nature and scope of the act of 1934, as hereinbefore fully pointed out. For the deprivation of former rights of creditors, other reasonable compensation is required to be fixed by the courts. The courts are open to mortgage creditors desiring to foreclose mortgages or deeds of trust on real estate; and if, on the hearing of the cause, it shall be determined that a foreclosure would, under the circumstances, be inequitable, the proposed sale may be postponed for the period therein fixed, on condition only that specified carrying charges shall be fixed by the court; and upon default in the payment of the said charges a final decree of sale may be entered. We think the relief afforded by the act here in question is appropriate to the emergency, and is granted upon reasonable conditions, and that consequently it does not contravene any of the provisions of our state Constitution.

Finally, the appellants seem to contend that the injunction should have been dissolved, for the reason that in his bill of complaint the appellee did not offer to pay, and request the court to fix, the benefits provided by the act for the mortgagee. The act requires that these bene-

fits must be fixed on the final hearing of the cause, and there is no requirement that the original bill shall offer to pay such benefits. In the case at bar, on account of an expressed doubt as to the right of the appellant to challenge the constitutionality of the act, and at the same time claim benefits thereunder, the appellants elected to move for a dissolution of the injunction on the ground that the act was unconstitutional, without any claim of benefits under the act. Upon the overruling of their motion to dissolve, they elected to prosecute an interlocutory appeal, and they are therefore not in a position to complain of the delay in fixing the benefits, which are properly determinable on the final hearing.

The decree of the court below will be affirmed, and the cause remanded.

Affirmed and remanded.

**Anderson, J.,** delivered a dissenting opinion.

Our mortgage moratorium statute is substantially the same as the Minnesota moratorium statute held to be constitutional by the Supreme Court in Home Building & Loan Association v. Blaisdell, 290 U. S. 398, 54 S. Ct. 231, 78 L. Ed. 413, 88 A. L. R. 1481. That decision, however, is not binding on the courts of the states having contract provisions in their Constitutions similar to that in the federal Constitution. It is only advisory and is of little value as advice because the court in several, previous, well-considered cases, whose soundness had gone unchallenged for more than seventy-five years, advised exactly to the contrary. Bronson v. Kinzie, 1 How, 311, 11 L. Ed. 143; McCracken v. Hayward, 2 How. 608, 11 L. Ed. 397; Gantly v. Ewing, 3 How. 707, 11 L. Ed. 794; Howard v. Bugbee, 24 How. 461, 16 L. Ed. 753; Gunn v. Barry, 15 Wall. 610, 21 L. Ed. 212; Walker v. Whitehead, 16 Wall. 314, 21 L. Ed. 357; Edwards v. Kearzey, 96 U. S. 595, 24 L. Ed. 793; Barnitz v. Beverly, 163 U. S. 118, 16

S. Ct. 1042, 41 L. Ed. 93; Bradley v. Lightcap, 195 U. S. 1, 24 S. Ct. 748, 49 L. Ed. 65. The contract clause in our Constitution and in that of the United States is exactly the same in meaning, and practically the same in language. If the Supreme Court holds a legislative act of a state violative of the federal Constitution, its decision is binding upon the state. But the converse is not true; if it holds that the state statute is not violative of the federal Constitution, the question is left open for the state courts to determine whether it is valid under its own Constitution.

The economic and financial depression in the 1840's was much worse than the one we have had for the last four years, which brought forth our mortgage moratorium statute. The state legislation involved in the Bronson, McCracken, and Gantly Cases, supra, was enacted in an effort to alleviate that emergency. The Illinois statute in the Bronson Case extended the period of redemption for twelve months after foreclosure decree, and prevented a sale unless two-thirds of the amount at which the property had been valued by appraisers should be paid. The McCracken Case dealt with the same Illinois statute and followed the Bronson Case. The Gantly Case involved an Indiana statute providing that no real property should be sold under execution for less than one-half of its appraised value. The statute, like the Illinois statute, was adopted for the benefit of hard-pressed debtors. The court held both statutes violative of the contract clause of the federal Constitution.

The obligation of a contract in the constitutional sense is not only the stipulations in the contract, but the means provided by the law for its enforcement. Whatever legislation lessens the efficacy of either impairs its obligation; if it tends to postpone or retard the enforcement of the contract, its obligation is, to that extent, weakened. The obligation of a contract is the law under which the

contract was made and includes the remedies for its enforcement which belonged to it at the time and place of its creation, or remedies equally adequate and effective. Hendrickson v. Apperson, 245 U. S. 105, 38 S. Ct. 44, 62 L. Ed. 178; Selover, Bates & Co. v. Walsh, 226 U. S. 112, 33 S. Ct. 69, 57 L. Ed. 146; White v. Hart, 13 Wall. 646, 20 L. Ed. 685; Gunn v. Barry, supra; In re Ayers, 123 U. S. 443, 8 S. Ct. 164, 31 L. Ed. 216; Nevitt v. Bank, 6 Smedes & M. 513; Commercial Bank v. Chambers, 8 Smedes & M. 9; Briscoe v. Anketell, 28 Miss. 361, 61 Am. Dec. 553; Price v. Harley, 142 Miss. 584, 107 So. 673; Coffman v. Bank of Kentucky, 40 Miss. 29, 90 Am. Dec. 311. Those decisions of the Supreme Court and of our court are much more ably reasoned than the decision of the Supreme Court in the Minnesota moratorium case (Home Building & Loan Association v. Blaisdell, 290 U. S. 398, 54 S. Ct. 231, 78 L. Ed. 413, 88 A. L. R. 1481).

In order to uphold our statute the Coffman Case must be overruled, and the principles laid own in the other Mississippi cases referred to destroyed. This ought not to be done. The majority opinion does it. The Coffman Case, supra, had under consideration the act of 1865, Laws 1865, page 236, which provided that all laws for the collection of debts on bonds, promissory notes, bills of exchange, open accounts or any other contract or liability for the payment of money should be suspended until the first day of January, 1868 (a period of two years), or until otherwise provided for by law, except in cases of official liability, and provided no creditor should be deprived of his remedy by attachment or distress; that the act should not apply to causes pending in courts where the parties agree to proceed with the trial, and that the statute should not apply to contracts made after its passage, unless founded upon an indebtedness existing prior to its passage. The court held the statute violative of the contract clause of both the state

and federal Constitutions, and also violative of section 24 of the Bill of Rights, which provides that all courts shall be open, and every person, for an injury done him in his lands, goods, person, or reputation, shall have remedy by due course of law, and right and justice shall be administered without sale, denial, or delay. The court held that the suspension of the right to sue closed the courts in violation of this provision of the Constitution. That statute was adopted to meet the economic and financial emergency following the Civil War. The court that decided that case was composed of Judges Handy, Harris, and Ellett, Mississippians—not carpet baggers—and able judges. Judge Handy wrote the opinion for the court. In discussing the conditions that brought about the enactment of the statute he used this language:

"It is a delicate duty under any circumstances, for this court to pronounce an act of a co-ordinate department of the government unconstitutional and void;.and the duty is especially painful when the act proceeded, as this evidently did, from the well-meant policy of relieving, as far as might be, the pecuniary distresses and prostration of a people unparalleled in our history—a state of things which appeals almost irresistibly to every benevolent mind, in which we all sympathize, and by which the interests of us all are most seriously affected. But, sitting here as the court of last resort of the State, and charged by the constitution with the duty to support that constitution and to sit in judgment upon the constitutional validity of the acts of the other departments of the government, we are not permitted to yield to feelings of delicacy to the legislature, or of personal sympathy for the misfortunes of our people when called on to discharge this high duty; but we are bound, by the most solemn obligations, to respond, truly and in the exercise of our best judgment, to the question, whether the act

is in violation of the Constitution of the United States or of this State. If this question were merely doubtful, we should defer to the wisdom of the legislature and act upon the presumption that the act is within their legitimate powers. But when it is the clear and deliberate conviction of our judgments that the act is repugnant to either of these constitutions, we must perform the duty committed to us and pronounce our judgment accordingly. Convinced as we all are, for the reasons above stated, that such is the character of the act of the legislature in question, we must hold it to be inoperative and void."

Judge Handy might have appropriately said more. For at least two decades before the Civil War the South had reached a state of high prosperity. There was practically no tenant class, the people were home owners. It was almost exclusively an agricultural country. Many of the plantation owners not only had the necessities and comforts, but also the luxuries, of life—carriages and fine horses and negro drivers in livery for social visiting and church going, servants to do everything. Even the overseers were furnished servants by the plantation owners. The necessities and comforts of life were general; almost every one had them. The War ended all this. About four million slaves were set free with nothing except the clothes on their backs to be cared for by their former masters. The larger part of the plow stock was gone, either dead or appropriated by the enemy. In fact, there was little left except the land. Then, added to that, came the curse of the carpet baggers and the scalawags. The white people of the South were equal to the emergency; they got out their spinning wheels and looms of pioneer days and spun and wove the cloth and made their own clothes; they tanned the leather and made their own shoes. The women did their own washing, ironing, and housework, and in addition many of them worked in the fields. Instead of carriages and drivers

in livery many of them went to church in mule wagons and ox wagons. On account of the scarcity of mules and horses, oxen were also often used for plowing. Shuck collars were used exclusively and grape vines were often used for trace chains. All food was produced at home, both for man and beast. It was not uncommon for the people to dig up the earth in smokehouses and boil the salt out of it for table use. Sorghum was almost exclusively used for sugar, and parched corn and wheat were often used for coffee. Still there was no starvation or freezing among the people. The present depression compared with that is as a mole hill to the highest mountain. The outgrowth of all these hardships was a strong, independent, self-reliant citizenship led by statesmen who were moulders of right thinking on public questions—statesmen of whom Mississippi should always be proud—Lamar, George, Walthall, Williams, Stone, Allen, Money, McLaurin, Catchings, and others.

The question involved in this case, as was in the Minnesota moratorium case, is whether the Constitution is a mere scrap of paper to be thrown aside when the people are confronted with unusual financial depression. The people have to pay the penalty for their economic wrongs; there is no escape from it; the payment may be delayed, but it has got to come. The verdict of the civilized world was against human slavery, that it was wrong both morally and economically. That verdict prevailed. The South paid the penalty, but in doing so, as above stated, the people in the long run were benefited instead of harmed.

The mortgage and the note it was given to secure stipulated a certain due date; it also expressly provided for the right of foreclosure by advertisement for three weeks and sale by a trustee as authorized by section 2167, Code 1930. The law provided also for foreclosure in chancery, which without unnecessary delay would

have taken place within six months after the filing of the bill for that purpose. At the option of the mortgagor the statute takes away entirely the remedy by foreclosure through a trustee, and at his option the foreclosure in chancery may be delayed for a period of two years. In other words, the enforcement of the statute might delay the payment of the note secured by the mortgage for two years after its maturity, and in addition sweep away entirely the remedy of foreclosure through a trustee, and materially impair the remedy of foreclosure in chancery. The statute, as was held in the Coffman Case, violates both the contract clause and that section of the bill of rights requiring the courts to be open to all litigants at all times and that justice be administered without delay. It is true that the statute does not close the door of the courts completely for the two-year period as the statute considered in the Coffman Case did, but in the administration of the statute that exact result might follow. The mortgagee may go into court, but the mortgagor, under the conditions named in the statute, could keep him there for two years. The door to the courts must be kept wide open, not partially open, and must stay open and justice administered without delay. That the mortgagee is given the net income from the property during the moratorium does not help the statute. Under his contract he had the right of foreclosure and purchase at the sale, if he was the highest and best bidder, and if not, to receive the proceeds of the sale up to a sufficiency to discharge his indebtedness. As purchaser he might have improved the property or changed its use to such an extent that the income therefrom during the moratorium period would be largely in excess of the net income in the hands of the mortgagor. If purchased by another, he might have succeeded in investing the proceeds coming to him so as to yield materially more than the net income from the mortgagor

during the moratorium. These are valuable rights. They were written into the contract and cannot be taken away by subsequent statute. The contract must be enforced as written through the remedies provided by the laws in existence when it was made, or remedies equally adequate and efficient.

The Constitution was adopted to make safe to the people certain fundamental rights whether in prosperity or in adversity, one of which was the sanctity of contracts. When there is general prosperity, there is no temptation for the Legislature and the courts to disobey the Constitution; it is during adversity that the temptation comes. Prosperity cannot be permanently restored by destroying these fundamental rights.

Dunn v. Love (Miss.), 155 So. 331, 92 A. L. R. 1323, is not decisive of this question. In fact, it has little, if anything, to do with it. In short, the court held in that case that the contract clause was not violated by denying the creditor what he contracted for and giving him instead something of equal value.

To repeat in different language: To uphold this statute is to flout the Constitution as a worthless thing.