JEFFERSON STANDARD LIFE INS. CO. *v.* NOBLE *et ux.*

(In Banc.    April 17, 1939.)

[188 So. 289.    No. 33587.]

Smith, Wharton & Hudgins, of Greensboro, N. C.,
Brady, Brady, Phillips & Bass, of Brookhaven, and Watkins & Eager, of Jackson, for appellants.

**Jas. F. Noble,** of Brookhaven, for appellees.

**McGowen, J.,** delivered the opinion of the court.

On June 18, 1930, the appellees executed a deed of

trust on their house and lot, their homestead in the City of Brookhaven, Mississippi, to secure a loan of $3600. The loan was to be repaid $180 semi-annually, with interest, and the deed of trust had a provision therein for a foreclosure in pais, with a trustee therein named, upon default of any semi-annual payment.

On December 15, 1934, Noble filed a petition, to which his wife afterwards became a party, under chapter 247 of the Laws of 1934, hereinafter designated as the Moratorium Law. The petition substantially complied with the requirements of said law relative thereto, and prayed for an injunction against the Jefferson Standard Life Insurance Company, appellant, restraining it and the trustee from proceeding with a sale of the property by foreclosure under its deed of trust. In that petition, he admitted that for two years he had not made the payments in accordance with the contract, and that he owed $3500 at that time. Promptly, on the fiat of the chancellor, the clerk of that court issued the injunction writ restraining the trustee from proceeding to foreclose in pais.

On April 15, 1935, the appellant filed its answer and cross-bill therewith, and the prayer of the cross-bill was that it be permitted to proceed with the foreclosure under the terms of the deed of trust, and for such relief in the alternative as was provided for its protection in the event of the postponement of the foreclosure as provided in the Act.

On April 25, 1935, the chancery court entered a decree providing for payment of reasonable rental on the property.

On October 28, 1938, the appellant filed its supplemental answer and set up that the two years' delay permitted by the Moratorium Act of 1934 had by its own terms ceased to operate on May 13, 1936. The supplemental answer further set up that there did not at that time exist in the State of Mississippi any economic or financial depression, or any state of emergency, and that

should either the Moratorium Law of 1934, or chapter 287 of the Laws of 1936, or chapter 346 of the Laws of 1938, be enforced or construed so as to permit the keeping in force of the injunction and forbid the foreclosure of the deed of trust, that such laws would violate both the Constitution of the United States and the State of Mississippi; and that such Moratorium Law of 1938 was unconstitutional and no longer enforceable.

On November 19, 1938, the appellees filed their reply to the supplemental answer, the important feature of which was that they alleged that they were still entitled to the benefits of the Moratorium Laws of the State of Mississippi and were protected by the 1938 statute. They denied that a depression or emergency did not now exist, and denied the unconstitutionality of the last law.

On November 26, 1938, the chancery court entered its decree overruling the motion to dissolve the injunction, denied any relief under appellant's cross-bill, and thereby continued the postponement of the foreclosure of the deed of trust, retained jurisdiction of the cause and granted an appeal to the appellant to settle all of the controlling principles in the case.

In the light of all the conditions existing in this State at the time of the passage of the law, at the time the decree was entered in this cause, and at this time, we have concluded that the question of the constitutionality or not of the Moratorium Law of 1938 is of such paramount importance as to warrant this court in disposing now finally of the question.

We now call attention to the fact that the recitals of the conditions upon which it declared the existence of an emergency in the preambles of the several Moratorium Laws of 1934, 1936 and 1938 were substantially, if not precisely, in the same language. In other words, in the several years in which the laws were passed, the Legislature based its declaration of emergency, as recited therein, warranting the assertion of the police power of the State to be upon the same prevailing conditions

in this State. The several Moratorium Laws did not materially differ except as to dates and extensions of time, especially as to foreclosure.

In Wilson Banking Company v. Colvard, 172 Miss. 804, 161 So. 123, 126, on April 22nd of that year, the court upheld the constitutionality of the law as to postponement of mortgages, foreclosure sales and extension of redemption periods under the terms thereof. In that opinion, we said: "The right of a state, in the exercise of its police power, to give temporary relief from the enforcement of contracts when an urgent public need produced by economic causes demands such relief, provided the relief afforded is of a character appropriate to the emergency and is granted upon reasonable conditions, is established by the decision of the Supreme Court of the United States in the case of Home Building & Loan Association v. Blaisdell, 290 U. S. 398, 54 S. Ct. 231, 78 L. Ed. 413, 88 A. L. R. 1481. And that it is always open to judicial inquiry whether the emergency still exists upon which the continued operation of such a law depends, was settled in the case of Chastleton Corp. v. Sinclair, 264 U. S. 543, 44 S. Ct. 405, 68 L. Ed. 841."

This court further said the legislative declaration of the existence of a serious public emergency and its recitals of the conditions in this state in April 1934 are entitled to great weight.

In Witherspoon v. State, 138 Miss. 310, 103 So. 134, we quote from the syllabus: "When a court takes judicial notice of a fact of which it must acquire knowledge, it may resort to any helpful source of information for that purpose, always seeking that which is most appropriate." In the opinion it is stated: "Notice and knowledge, however, are different things, and, when a court takes judicial notice of a fact it must acquire knowledge thereof in order to act upon it. This knowledge the court can acquire without being restricted in so doing by the rules of evidence 'from any source of knowledge which he feels would be helpful to him, always seeking

that which is most appropriate, including public official documents or records of all kinds. . . . He may resort to any public document properly authenticated, or to government publications, dictionaries, encyclopedias, geographies, or other books, periodicals, and public addresses.' 23 Corpus Juris, 169; 1 Jones on Evidence, 641; Rodgers v. Kline, 56 Miss. 808, 31 Am. Rep. 389; Puckett v. State, 71 Miss. 192, 14 So. 452.'' Also see Briscoe v. Buzbee et al., 163 Miss. 574, 143 So. 407, 887; Vicksburg Waterworks Company v. J. M. Guffy Petroleum Company, 86 Miss. 60, 38 So. 302; Adams v. Standard Oil Company, 97 Miss. 879, 53 So. 692; Atlantic Life Insurance Company v. Klotz et al. (Miss.), 181 So. 519; Home Building & Loan Association v. Blaisdell, 290 U. S. 398, 54 St. Ct. 231, 78 L. Ed. 413, 88 A. L. R. 1481.

Resorting to departmental reports of this state and of the federal government, we take judicial knowledge of conditions existing at the time of the passage of the Moratorium Laws of 1938, chapter 346, approved March 16, 1938, and by which, of its own limitation, the operation of the law expires on May 1, 1940.

When the 1934 Moratorium Law was passed, there existed a worldwide depression, and in this state a most unusual and unprecedented emergency, in its relation to the people and the government of the state, known in its history. The banks of the state were rapidly closing due to the withdrawal of deposits therefrom, the shrinkage of value of its securities, and the depressed trade conditions generally throughout the state; taxes were not being paid and thousands of acres of land were being forfeited to the state by tax sales; and property was being sold at a distressing sacrifice, not approximately normal or real values, at mortgage foreclosure sales and execution sales. The condition of the farmer was deplorable. There was for him no lending agency. Seed could not be obtained with which to produce another crop. Credit was suspended. In fact, every line of endeavor, including labor and industry, was well nigh

paralyzed, and it was under these conditions that the Moratorium Law of 1934 was enacted; and it was thought by this court in upholding the constitutionality of that law that these conditions had not passed at the time it was then being considered by it.

We now present the economic conditions with reference to emergency as we find they existed, having judicial knowledge thereof from the sources we have above indicated, and of which we taken judicial notice.

In 1934, we find the following with reference to the chief product of this state—cotton: 1,143,000 bales were produced, the average price of which was 12½c per pound; in 1935, 1,259,000 bales, the average price of which was 11.32c per pound; in 1936, 1,911,000 bales, the average price of which was 12.97c per pound; in 1937, there were 2,692,000 bales, the average price of which was 8.15c per pound. The total farm income, including government payments, for these same years was: 1934, $128,211,000; 1935, $140,253,000; 1936, $189,014,000; 1937, $168,000,036. While in the year 1933, just prior to the passage of the Moratorium Law of 1934, this total value was only $87,202,000.

Another interesting statement from the United States Department of Agriculture shows that the voluntary sales per 1000 farms in this state were: 1933, 17.9; 1934, 18.3; 1935, 21.4; 1936, 32.3; and 1937, 42.0. While for the same year (1938) throughout the United States, such average was 31.5. Considering tax sales per thousand farms from the same department of the government, we find that they were 65.8 in 1932; 67.7 in 1933; 69.9 in 1934; 34.3 in 1935; 26.2 in 1936; and 20.04 in 1937.

Perhaps one of the best barometers of the comparative situation is the gross retail sales tax collections, which in this state is 2c on each $1 sale. From the Mississippi State Tax Commission the following figures are revealed: May 1, 1933, to April 30, 1934, sales tax collections were $3,066,511.54; with a steady progressive advancement upward from May 1, 1937, to April 30, 1938, when the sales

tax collections were $6,136,273.13. In other words, the gross retail business in the latter year was $306,813,656; as against a gross retail business for the year beginning April 1933 of only $153,325,577. The income tax collections have increased in a like proportion.

In 1933 and 1934, as we have heretofore said, there was almost a complete lack of credit. Congress has lavished upon the farmers of this state and of this country the most extensive and liberal line of credits ever known in the history of the country. Beginning with the year 1933, Congress passed an Act, chapter 25, section 32, 48 Stat., 31, 12 U. S. C. A., section 1016, which directed the Federal Land Bank to loan 75% of value, postponing payment of principal for five years at 4½% interest. It set up lending agencies by which the farmer might have credit in order to purchase planting seed. It provided a method by which the farmer was enabled to get credit on what had been theretofore inconceivable methods, and these agencies have been functioning in this state. In addition to that, Congress has passed an act setting up agencies which furnish laborers who are unemployed preference in contracts for public work throughout this state.

In 1933, prior to the passage of the Moratorium Law of this state, the President of the United States found it necessary to close all of the banks of this country. We now have judicial knowledge that condition of the banking business is most healthy. There is no cry of distress in regard to this vital part of the economic structure of the state. The fact is that the surplus in the banks has increased by a million and a half dollars; and the report of the State Comptroller of Banks shows that only five banks have discontinued operation during the two-year period; and the depositors of those banks have been paid in full. At the time of the passage of the 1934 law, the withdrawals from the banks by the depositors were rapidly closing the doors of these institutions. The contrast between those lean years, when lines of people

formed to withdraw their deposits from the banks, and conditions today throughout the state, when people may be found in line, depositing their money therein, is very great. In a large measure confidence in the banks has been restored.

Prior to the passage of this law, the state government itself was threatened with default, so that it was necessary for the Legislature to pass a resolution, impounding all the funds in the treasury to be appropriated to the payment of interest on public debts. School teachers and other employees of the state were unpaid for many months. Today, in 1938, the report shows its treasury to be in a most healthy condition.

We shall not continue comparison of the two periods —we have set forth the contrast sufficiently. We think it is beyond reasonable dispute that there existed in 1938 no such conditions as certainly obtained in 1934. The Moratorium Law undoubtedly postponed the right of the creditor to have the contract performed in accordance with its terms. It is temporary in its nature, as is indicated by every decision in reference to it, including that in the Blaisdell case decided by the Supreme Court of the United States, and followed by us in the case of Wilson Banking Company v. Colvard, supra.

What, then, is an emergency? In Attala County v. Mississippi Tractor & Equipment Company, 162 Miss. 564, 139 So. 628, is found this answer: ''An emergency is 'an unforseen occurrence or combination of circumstances which calls for immediate action or remedy; a pressing necessity.' '' In considering the moratoria enacted by the Legislature every two years, before the Legislature would be authorized to invoke the police power, as applied under the Blaisdell case, supra, under the Federal Constitution the public emergency must be urgent within the state; and when the emergency ceases, the statute permitting the court to enjoin the enforcement of a perfectly valid contract immediately ceases; and its enforcement after the emergency no longer exists,

violates the contract clause of the Federal Constitution, U. S. C. A., article 1, section 10. The theory of the Moratorium Law, upon which it ran the Constitutional gauntlet, was that upon equitable principles, the postponement of a foreclosure in pais was permitted to be operative only while, and so long as, the public emergency existed. It cannot be gainsaid, it cannot be controverted, that in the absence of a public emergency, the restrictions imposed upon the mortgagee by the passage of a Moratorium Law every two years authorizing the chancery court to postpone the enforcement of a valid contract as to foreclosure, in effect, denied the mortgagee its remedy and so hampered it with conditions or restrictions as seriously to impair the value of the right to collect its debt by foreclosure, is the situation which confronted the mortgagee when the motion to dissolve the injunction herein was presented; extensions were so continuous as to make the remedy, in reality, a shadow. We are led to the irresistible conclusion, on the basis of our judicial knowledge, that when the Legislature passed the Moratorium Law of 1938 no public emergency existed in this state. There was no longer a crisis. There was no longer a catastrophe. There was no longer reason, truth or facts, to justify its reenactment.

In that situation, it is our duty to declare the Moratorium Law of 1938 unconstitutional, void, and unenforceable after the date of its passage. We can do no better than quote the language of Mr. Justice HOLMES on this subject, found in Chastleton Corporation v. Sinclair, 264 U. S. 543, 44 S. Ct. 405, 406, 68 L. Ed. 841, wherein he said in part: ''We repeat what was stated in Block v. Hirsh, 256 U. S. 135, 154, 41 S. Ct. 458, 65 L. Ed. 865, 16 A. L. R. 165, as to the respect due to a declaration of this kind by the Legislature so far as it relates to present facts. But even as to them a court is not at liberty to shut its eyes to an obvious mistake, when the validity of the law depends upon the truth of what is declared.''

Let it be remembered that the contract clause of the

Federal Constitution originated in an economic and financial emergency, which obtained following the Revolutionary period, and the legislatures had passed ignoble schemes for the defeat of creditors and the invasion of contractual obligations; and was adopted to "inspire a general prudence and industry, and give a regular course to the business of society." See Blaisdell case, supra [290 U. S. 398, 54 S. Ct. 236].

So far as credit is concerned, looking to the welfare of the whole state, it is vitally important that unnecessary and uncalled for restrictions be unloosed and contracts made with impunity and confidence; that fear, suspicion, and distrust may be obviated.

In the consideration of this case and its solution, we have not discussed the depression except as it may be related to a public emergency. The economic depression may be with us continuously as our normal status, but what we have said is that a public emergency cannot be said to have existed in 1938, nor does it exist now. It may be that the thing which was at one time considered extraordinary has now become ordinary. We do not say that economic conditions are normal. We doubt if expert economists can fix with reasonable certainty a financial and economic standard.

Public emergency as herein referred to must of necessity be temporary in character. An economic depression may not be temporary. The exercise of the police power of the state may not be exerted, simply because of such a depression, although it may be a prime factor in thrusting a public emergency upon a commonwealth.

The views adopted by us are in some measure supported by the Supreme Court of Iowa in the case of First Trust Joint Stock Land Bank of Chicago v. Arp et al., 283 N. W. 441, decided January 10, 1939.

This leads to the conclusion that the contract clause of the Federal Constitution will be violated by the further enforcement of the Moratorium Law of 1938.

The general purpose of this clause of the Federal Con-

stitution, and the beneficent effect of its restricting influence upon Legislatures, is described in the following language of Chief Justice MARSHALL in Ogden v. Saunders, 12 Wheat. 213, 354, 6 L. Ed. 606; " 'The power of changing the relative situation of debtor and creditor, of interfering with contracts, a power which comes home to every man, touches the interest of all, and controls the conduct of every individual in those things which he supposes to be proper for his own exclusive management, had been used to such an excess by the state legislatures, as to break in upon the ordinary intercourse of society, and destroy all confidence between man and man. This mischief had become so great, so alarming, as not only to impair commercial intercourse, and threaten the existence of credit, but to sap the morals of the people, and destroy the sanctity of private faith. To guard against the continuance of the evil, was an object of deep interest with all the truly wise, as well as the virtuous, of this great community, and was one of the important benefits expected from a reform of the government.' "

The court below should have finally dismissed the petition of the appellee in the case at bar, and should not have further suspended the hearing thereof on the crossbill and answer thereto. To that end, the case will be remanded to the lower court to be proceeded with in accordance with this opinion.

Reversed and remanded.