FIRST TRUST COMPANY OF LINCOLN, TRUSTEE, APPELLANT,
v. WALTER C. SMITH ET AL., APPELLEES.

277 N. W. 762

FILED FEBRUARY 22, 1938.   No. 30218.

*Hall, Cline & Williams,* for appellant.

*J. A. Brown* and *W. O. Brown, contra.*

*Perry W. Morton, amicus curiæ.*

Heard before Goss, C. J., Rose, Eberly, Day, Paine, Carter and Messmore, JJ.

Eberly, J.

This is an appeal from the judgment of the district court for Lancaster county, presented here as a case stated, settled and allowed by the trial court.

The appellant contests the validity of chapter 42, Laws 1937, being the last amendment to the Nebraska moratorium law, as being repugnant to the "contract clause," U. S. Const. art. I, sec. 10, to the "due process clause" and the "equal protection clause" of section 1, of the Fourteenth Amendment to the federal Constitution; and also as repugnant to, and in contravention of, the following provisions of the Constitution of the state of Nebraska, viz., the "contract clause," article I, sec. 16; the "due process clause," article I, sec. 3; section 13, art. I in that it deprives appellant of its remedy by due course of law and denies to appellant the administration of justice without denial or delay; and, lastly, that it violates section 21, art. I. The district court sustained the act, and plaintiff appeals.

The record discloses that on May 1, 1929, the defendants, Walter C. Smith et al., made, executed and delivered to plaintiff, the First Trust Company of Lincoln, their promissory note, by the terms of which they promised to pay

to the order of said company $8,000 with interest at 6 per cent. per annum payable semiannually until maturity or default, and at the rate of 10 per cent. thereafter. The principal was payable, $2,000 May 1, 1930, $3,000 May 1, 1931, and $3,000 May 1, 1932. To secure the payment of these sums, and conditioned for the performance of the contract evidenced by such note, the defendants on the said 1st day of May, 1929, duly executed to the plaintiff their mortgage deed and thereby mortgaged to it the premises here in suit; and in addition also in such mortgage they covenanted and agreed to pay any and all taxes or assessments levied upon the aforesaid note or upon the mortgage securing the same, as well as upon the mortgaged premises, and also obligated themselves to procure, deliver and keep in force insurance policies upon the mortgaged premises, "for not less than $10,000, loss payable to the mortgagee, its successors or assigns, as their interest may appear." The mortgage further stipulated that "time is of the essence of this contract," and upon a failure to perform the mortgagors' covenants by them, including prompt payment of principal and interest when due, the whole indebtedness secured thereby, at the option of the mortgagee, its successors or assigns, should immediately become due and payable; and that immediately upon commencement of suit in foreclosure, the mortgagee, its successors or assigns, should be entitled to possession of said premises, and all rents and profits derived from said premises should, upon default of any of the provisions of this mortgage, be applied on the debt secured thereby. Said mortgage was duly recorded, as by law provided, and on May 1, 1932, the mortgage indebtedness having been reduced to $3,000, by agreement in writing bearing date of May 1, 1932, the time of payment of said indebtedness and the terms of the writing evidencing the same were duly extended so that the amount secured thereby was to be paid as follows: $500 May 1, 1933, $500 May 1, 1934, $500 May 1, 1935, $500 May 1, 1936, and $1,000 May 1, 1937, and the interest thereon during said extension was to be paid at the rate of

6 per cent. per annum. On account of failure of the mortgagors to pay interest and taxes as covenanted by them, plaintiff exercised its stipulated option and proceedings for foreclosure of the mortgage were commenced in the district court for Lancaster county on February 9, 1934, and a decree of foreclosure and order of sale were entered in this cause on April 12, 1934, adjudging plaintiff's mortgage to be a first lien on the premises in suit, and that there was due thereon $3,354.38 with interest at 10 per cent. from April 2, 1934. On April 27, 1934, the statutory written request for nine months' stay was filed by the mortgagors. Thereafter, on application of the mortgagors, a further order of stay until March 1, 1937, was entered in said cause under the provisions of chapter 41, Laws 1935, the Nebraska moratorium act then in force, conditioned on the payment of rental in the sum of $50 a month.

On the termination of this period an additional stay was again applied for by the defendants, pursuant to the moratorium amendment of 1937, Laws 1937, ch. 42, which was challenged by plaintiff upon the constitutional grounds hereinbefore set forth. On May 8, 1937, the trial court sustained Legislative Bill No. 4, Laws 1937, ch. 42, and granted a further moratorium stay to March 1, 1938, conditioned on the payment of a monthly rental of $50 a month. It further appears from the record that the moratorium rentals have been paid to and including February 28, 1937; that taxes for the years 1929 to 1936 have never been paid by the defendants; and after application of all moratorium rents to defray the same, there remains unpaid taxes "as of March 2, 1937," amounting to $1,600. By stipulation of the parties it is agreed that the value of the mortgaged property, as of March 2, 1937, was between $8,500 and $12,000. It appears by necessary implication that this judicial action in effect denied the enforcement of the specific covenants contained in the mortgage deed, except in so far as might be covered by the annual rental as fixed by the order of the trial court.

The moratorium act under consideration commences with

the enactment of chapter 65, Laws 1933, approved March 2, 1933. This act recited the declaration of the existence of an emergency by the governor of the state, and a like determination by the legislature. It contained seven sections.

By section 1 it was commanded: "In all actions now pending or hereafter commenced for the foreclosure of real estate mortgages, deeds of trust, land sale contracts or on notes secured thereby * * * while this act is in effect, the court shall, upon application of the owner or owners of said real estate or persons liable on said mortgages * * * or notes secured thereby, made at any time after the decree of foreclosure or judgment is rendered and before confirmation of the sale of the premises, unless upon hearing on said application, good cause is shown to the contrary, order that all further proceedings in such action be stayed until the first day of March, 1935." (Then followed directions governing the enforcement of the act.)

Section 2 required the recommendation of conciliation.

Section 3 provided: "This act shall expire and shall be of no force and effect from and after twelve o'clock midnight, March 1, 1935."

Section 4 was a legislative declaration of intent that all instruments affected by the act should be submitted "to the ordinary regular course of justice and to pursue in substance existing remedies with respect thereto."

Section 5 was occupied in legislative declaration of emergencies and the invocation of the police power of the state.

In 1935 the foregoing legislation was, by amendment, in effect extended to March 1, 1937, by chapter 41, Laws 1935, approved February 27, 1935, this being "An act to amend" the moratorium law of 1933.

By such 1935 act section 1 of the act of 1933, with certain amendments not material to the questions here presented, was in effect amended and reenacted, extending the concluding date of stay to March 1, 1937.

Section 3 of the act of 1933 was amended to read as

follows: "By its own specific limitations in this section contained, this act shall expire and shall be of no force and effect from and after twelve o'clock midnight, March 1, 1937."

The remainder of the act of 1933 was continued in force.

Two years still later, by the enactment of chapter 42, Laws 1937, approved February 16, 1937, being "An act to amend" the moratorium law as amended in 1935, section 1 of the act of 1933, as amended by section 1 of the act of 1935, was again amended and reenacted, and stay of proceedings provided thereby extended from March 1, 1937, to March 1, 1939, and other changes made therein not material to the questions now under consideration.

Section 1 of the act of 1937 contained a legislative declaration of emergency.

Section 3 of this last amendatory enactment is as follows: "Notwithstanding any more general or special law respecting actions at law on notes secured by real estate mortgages, deeds of trust or land sale contracts, or on contracts secured by real estate mortgages, deeds of trust or land sale contracts, from and after the passage and approval of this act, the court shall, upon application of the owner or owners of such real estate or person or persons liable on such notes or contracts, secured as aforesaid, made within twenty days after the rendition of judgment on such actions at law, enter an order staying all sales under execution against the property of the judgment debtor or judgment debtors for a period of nine months from and after the rendition of such judgment, whenever the judgment debtor or judgment debtors shall, within twenty days after the rendition of such judgment, file with the clerk of the court a written request for the same: Provided, if the judgment debtor or judgment debtors make no such request within twenty days, the sale under execution shall immediately be had after the expiration thereof. The court shall, at the expiration of such stay, unless upon hearing, for good cause shown to the contrary,

further order that all further proceedings in such actions at law shall be stayed until the first day of March, 1939, or so long as this act is in effect under such conditions, provisions and terms as the court may deem just and equitable: Provided, the provisions of this act shall not apply to any mortgage, deed of trust, land sale contract, or note secured thereby, executed subsequent to March 1, 1934, nor shall it apply to any owner or owners who acquired the real estate subsequent to March 1, 1934. All applications for stays heretofore filed under the provisions of sections 20-21,159 to 20-21,164, Comp. St. Supp. 1933, as amended by chapter 41 of the Session Laws of Nebraska for the year 1935, shall be considered as filed under the provisions of this act and it shall be unnecessary in such cases to file new applications therefor."

Other provisions of the original act of 1933, by necessary implication, are again continued in force and effect, and section 6 reenacts the provision found in all former enactments that, if any section, clause or part of the act should be adjudged invalid, such judgment should not affect nor invalidate the remainder of the act, etc.

The form of the present moratorium legislation and the history of the enactments thereof involve two rules of statutory construction, viz.:

(1) "The section of an act properly amended should be construed precisely as though it had been originally enacted in its amended form." *State v. Hevelone*, 92 Neb. 748, 139 N. W. 636. See, also, *In re Heirship of Robinson*, 119 Neb. 285, 228 N. W. 852.

(2) "Where, by amendment and repeal, the words of a former statute or section of a statute are changed in some respects, but it is intended that the statute shall continue to operate, it is not strictly a repeal, but a continuation of the former law as amended." *Morgan v. City of Falls City*, 103 Neb. 795, 174 N. W. 421. See, also, *Hiddleson v. City of Grand Island*, 115 Neb. 287, 212 N. W. 619.

It, therefore, follows that in the instant case we are dealing with a six-year moratorium statute, which has yet

until March 2, 1939, to run, and not with a two-year moratorium act of which eleven months have expired.

This case is presented by the appellant to this court solely upon the constitutional questions involved, and the relief sought is the determination that the moratorium statute of Nebraska, as amended in 1937, is unconstitutional. The appellees insist that powers created by the statute challenged are rights supported by the emergency which its terms declare.

Ordinarily, the constitutionality of a statute will not be determined on review where the question to be determined was not presented below. *Pill v. State,* 43 Neb. 23, 61 N. W. 96. But the record here discloses a full compliance with this controlling principle of judicial review. This was necessary, for the court will not anticipate a question of constitutional law in advance of the necessity of deciding it, and will not formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied. *Howarth v. Becker,* 131 Neb. 233, 267 N. W. 444.

The effect of section 6 of the act under consideration, which relates to the separability of the various parts of the statute under consideration, presents a question which has heretofore engaged the attention of this court. The result of its consideration is well epitomized in *Hubbell Bank v. Bryan,* 124 Neb. 51, 245 N. W. 20, in the following language.

"Provision expressing legislative intent as to the separability of the various parts of a statute is an aid merely to judicial interpretation.

" 'The legislative intent is the cardinal rule in the construction of statutes.' *King of Trails Bridge Co. v. Plattsmouth Auto & Wagon Bridge Co.,* 114 Neb. 734."

Preliminary to constitutional questions presented by the appellant is the determination of the force and effect of the legislative declaration of emergency found in section 1 of the act of 1937. Is the legislative determination of its continuance for the period fixed by legislative declara-

tion conclusive on the courts? The 1937 act proceeds on the theory that the existence of the emergency recited therein is a complete and adequate justification for the enactment of the amended law and its continued vitality thereafter. But a necessary corollary to this proposition is, emergency being essential to its continuance, the cessation of the emergency terminates the law supported thereby. In consideration of this question with reference to the federal Constitution, the rule as announced by the supreme court of the United States is controlling, and where it relates to similar provisions of the state Constitution it becomes at most but persuasive.

In *Chastleton Corporation v. Sinclair*, 264 U. S. 543, 68 L. Ed. 841, Justice Holmes has suggested that under these circumstances, so far as the declaration of emergency looks to the future, it involves the exercise of the powers of prophecy. The test of prophecy given by Holy Writ is: "If the thing follow not, nor come to pass, that is the thing which the Lord hath not spoken." Deut. 18:22. The test of prophecy, it would seem, whether legislative or otherwise, is therefore determinable in the present after the future has become the past, by those who are then required to act upon it or whose action is controlled by it, in the light of then existing circumstances.

Such *Chastleton* case is quite in point. It was one of the rent cases determined by the supreme court of the United States in 1924, and arose out of the following legislative situation:

"The original act of October 22, 1919, ch. 80, title II, 41 St. 297, considered in *Block v. Hirsh,* was limited to expire in two years. Sec. 122. The act of August 24, 1921, ch. 91, 42 St. 200, purported to continue it in force, with some amendments, until May 22, 1922. On that day a new act declared that the emergency described in the original title II still existed, reenacted with further amendments the amended act of 1919, and provided that it was continued until May 22, 1924. Act of May 22, 1922, ch. 197, 42 St. 543."

In discussing the force and effect of the legislative declaration, Justice Holmes, in delivering the opinion of the supreme court of the United States in such *Chastleton* case, to which none dissented, said, in part:

"We repeat what was stated in *Block v. Hirsh*, 256 U. S. 135, 154, as to the respect due to a declaration of this kind by the legislature so far as it relates to present facts. But even as to them a court is not at liberty to shut its eyes to an obvious mistake, when the validity of the law depends upon the truth of what is declared. 256 U. S. 154. *Chas. Wolff Packing Co. v. Court of Industrial Relations*, 262 U. S. 522, 536. And still more obviously so far as this declaration looks to the future it can be no more than prophecy and is liable to be controlled by events. A law depending upon the existence of an emergency or other certain state of facts to uphold it may cease to operate if the emergency ceases or the facts change even though valid when passed. *Perrin v. United States*, 232 U. S. 478, 486, 487; *Missouri v. Chicago, B. & Q. R. Co.*, 241 U. S. 533, 539, 540. In *Newton v. Consolidated Gas Co.*, 258 U. S. 165, a statutory rate that had been sustained for earlier years in *Willcox v. Consolidated Gas Co.*, 212 U. S. 19, was held confiscatory for 1918 and 1919. * * *

"We need not inquire how far this court might go in deciding the question for itself, on the principles explained in *Prentis v. Atlantic Coast Line Co.*, 211 U. S. 210, 227. See *Gardner v. The Collector*, 6 Wall. 499; *Town of South Ottawa v. Perkins*, 94 U. S. 260; *Jones v. United States*, 137 U. S. 202; *Travis v. Yale & Towne Mfg. Co.*, 252 U. S. 60, 80. These cases show that the court may ascertain as it sees fit any fact that is merely a ground for laying down a rule of law, and if the question were only whether the statute is in force today, upon the facts that we judicially know we should be compelled to say that the law has ceased to operate."

It follows, without consideration of the constitutional questions presented by this record, that the controlling rules applicable to the instant case, are: That legislation

expressly by its terms based upon the existence of a definite emergency therein declared, or other state of facts to uphold it, may never possess validity if an obvious and vital mistake has occurred in the truth of the declaration upon which it is founded, or may cease to operate if the emergency ceases or the facts change, even though valid when passed. And this court, by virtue of its inherent powers constitutionally conferred, in its application of such statute, may ascertain as it sees fit any fact that is merely a ground for laying down a rule of law.

Proceeding further, and for the present excluding constitutional considerations, in logical sequence the next question presented under the principles just discussed is the present validity of the Nebraska moratorium law, as amended in 1937, considered as an emergency measure, whose commands and sanctions are necessarily conditioned on the present existence and continued sufficiency of the facts set forth in section 1 thereof.

Appellees contend that principles announced in *Home Bldg. & Loan Ass'n v. Blaisdell,* 290 U. S. 398, 78 L. Ed. 413, necessitate the affirmative, and fully support the validity of the provisions here considered. The legislation under consideration in such *Blaisdell* case was chapter 339, Laws of Minnesota for 1933, and came before the supreme court of the United States as an appeal from a judgment of the supreme court of Minnesota sustaining the statute, rendered on July 7, 1933. 189 Minn. 422, 249 N. W. 334. Chief Justice Hughes, in the majority opinion of the supreme court of the United States, quotes approvingly the following from the opinion of the state supreme court, as a factual basis which supports the legislation then before the court, viz.:

"Not only they (members of the legislature), but the courts must be guided by what is common knowledge. It is common knowledge that in the last few years land values have shrunk enormously. Loans made a few years ago upon the basis of the then going values cannot possibly be replaced on the basis of present values. We all know that

when this law was enacted the large financial companies, which had made it their business to invest in mortgages, had ceased to do so. No bank would directly or indirectly loan on real estate mortgages. Life insurance companies, large investors in such mortgages, had even declared a moratorium as to the loan provisions of their policy contracts. The President had closed banks temporarily. The congress, in addition to many extraordinary measures looking to the relief of the economic emergency, had passed an act to supply funds whereby mortgagors may be able within a reasonable time to refinance their mortgages or redeem from sales where the redemption has not expired. With this knowledge the court cannot well hold that the legislature had no basis in fact for the conclusion that an economic emergency existed which called for the exercise of the police power to grant relief."

To this should be added the following from a concurring opinion of Justice Olsen of the Minnesota supreme court: "Millions of the people's money were and are yet tied up in closed banks and in business enterprises."

Taken as an entirety these statements, in connection with other recitals of this opinion, afford proper basis for the conclusion that the then world-wide business and financial crisis had attained such proportions as to substantially interrupt and effectually destroy the ordinary and usual course of business and finance.

It is obvious from the foregoing quotations, as well as from the majority opinion of Chief Justice Hughes as an entirety, that, under such surrounding circumstances, the continued due and regular enforcement of contracts to which the Minnesota moratorium applied by courts, both federal and state, in the orderly course of judicial procedure, would result in the sacrifice of the property involved at judicial sale prices far below its actual and reasonable value. This constituted the crux of the exigency.

In such *Blaisdell* case the following appears: "As the supreme court of Minnesota said, the economic emergency which threatened 'the loss of homes and lands which fur-

nish those in possession the necessary shelter and means of subsistence' was a 'potent cause' for the enactment of the statute."

"Emergency" is defined specifically as a perplexing contingency or complication of circumstances. That this conclusion is true is seen in the fact that the only remedy applied or sought to be applied by the legislation under consideration was in the nature of a stay of the postponement of the consummation of the necessary legal proceeding to secure regular enforcement.

The majority opinion in such *Blaisdell* case postulates that the protective power of the state, the police power, may only be invoked in this case, and the relief afforded and justified by an emergency, temporary in nature, in order not to contravene the federal constitutional provisions, could only be of a character appropriate to that emergency, and could be granted only upon reasonable conditions.

In *Worthen Co. v. Kavanaugh,* 295 U. S. 56, 79 L. Ed. 1298, Justice Cardozo, after distinguishing that case from the facts in the *Blaisdell* case, says, in part: "A different situation is presented when extensions are so piled up as to make the remedy a shadow. * * * What controls our judgment at such times is the underlying reality rather than the form or label. The changes of remedy now challenged as invalid are to be viewed in combination, with the cumulative significance that each imparts to all. So viewed they are seen to be an oppressive and unnecessary destruction of nearly all the incidents that give attractiveness and value to collateral security." See, also, *Worthen Co. v. Thomas,* 292 U. S. 426; *Louisville Joint Stock Land Bank v. Radford,* 295 U. S. 555.

Recurring to the recitals of facts made in the *Blaisdell* case in support of the Minnesota moratorium, and bearing in mind that all transactions entered into since March 1, 1934, are wholly excluded from the Nebraska moratorium, as amended in 1937, now under consideration, and that we are dealing with a six-year moratorium in the present

case, and a moratorium of but two years in extent was before the courts in the *Blaisdell* case, it must be admitted that land values have not been restored to the prices they had attained prior to March 1, 1934, and that maximum farm loans made on the speculative basis that obtained during some of the years prior to that date cannot now be refinanced. It also may be accepted as true that the state of Nebraska in the year 1936 experienced an unprecedented drouth and that certain parts of the state suffered from insect pests. But we are required to take notice of the fact that under the emergency farm mortgage act of May 12, 1933, 48 St. at Large, 41, ch. 25 (and as subsequently amended), the Federal Land Banks and the Land Bank commissioner were empowered to loan farmers 75 per cent. of the normal value of their land at 4½ per cent. interest for the first five years and 5 per cent. thereafter, and no repayment of principal was to be required for five years (*Louisville Joint Stock Land Bank v. Radford*, 295 U. S. 555, 55 Sup. Ct. Rep. 854, note 4) ; and that mortgage loans made to farmers by this agency aggregated $2,661,-558,017, as of March 31, 1935, and their work has not ceased. Large financial companies have reentered the mortgage investment field. Ninety-seven per cent. of all banks closed by the President in March, 1933, in due time reopened with capital unimpaired, and all deposits entrusted to their care preserved without loss. Since 1934 the banks of the nation have been entrusted with deposits in unprecedented amounts. Other loaning agencies of the federal government have been engaged in the work of refinancing farm mortgages. Failed banks and financial institutions whose insolvency occurred prior to March 1, 1934, have been largely liquidated. Insurance companies have long since abandoned the protection of moratoria, and continue their business as contemplated by their contracts. Millions of dollars in the hands of investors are awaiting investment under conditions assuring safety and preservation of principal and prompt payment of interest and principal, according to terms of contracts made. Millions

of dollars have been invested since March 1, 1934, in short term paper yielding less than 1 per cent. per annum. It appears that there is no crisis now prevailing which involves a general paralysis of business and finance, and that the unfortunate condition now confronting us is strictly a "continued depression."

Admitting that certain mortgagors whose obligations were created prior to March 1, 1934, secured their loans upon a basis of land values which prevents their mortgages being now refinanced, even as to them, as an actual fact, no temporary emergency exists supporting the validity of the present Nebraska moratorium, as is substantially required by the principles announced in *Home Bldg. & Loan Ass'n v. Blaisdell, supra.*

It must be remembered that the prerequisite to the enforcement of our moratorium statute, as amended in 1937, is that only such mortgagors or owners as have an interest in their lands over and above the liens against them are entitled to relief under its terms. Such, indeed, has been the construction given by courts to similar legislation. *Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U. S. 398, 78 L. Ed. 413; *Blaisdell v. Home Bldg. & Loan Ass'n,* 189 Minn. 422, 249 N. W. 334; *Bukowski v. Travelers Ins. Co.,* 196 Minn. 31, 264 N. W. 217; *Falk v. Massachusetts Mutual Life Ins. Co.,* 196 Minn. 341, 265 N. W. 60; *National Bank of Aitkin v. Showell*, 195 Minn. 273, 262 N. W. 689; *Young v. Penn Mutual Life Ins. Co.,* 192 Minn. 446, 256 N. W. 906; *Clark v. Hass*, 129 Neb. 112, 260 N. W. 792; *Howarth v. Becker*, 131 Neb. 233, 267 N. W. 444; *First Trust Co. v. Rathbone*, 132 Neb. 211, 271 N. W. 428.

In the first session of the 74th congress there was duly enacted "An act to amend an act entitled, 'An act to establish a uniform system of bankruptcy throughout the United States,' approved July 1, 1898, and acts amendatory thereof and supplementary thereto." 49 St. at Large, 942, ch. 792. This act was approved August 28, 1935. It was amendatory and supplementary to the amendatory act of March 3, 1933, 47 St. at Large, 1467, ch. 204. It now forms

a part of chapter 8, title 11 of the bankruptcy act. 11 U. S. C. A. ch. 8, sec. 203. The legislation as thus amended is designed to aid victims of the general economic depression. It provided as an exercise of the bankruptcy powers conferred by our national Constitution a system of legal remedies, the enforcement of which is vested in the federal courts, which adequately protect every right of farmer debtors and landowners, and which in terms the Nebraska amendatory moratorium act of 1937 sought to secure. From the standpoint of the farmer debtor and agricultural landowner this federal legislation is wider in scope and more beneficial in results than the state legislation now under consideration here. All such real estate mortgages, irrespective of date of execution, are included within its terms, and the mortgage, deed of trust, land sale contract, or note secured thereby, executed subsequent to March 1, 1934, is not discriminated against. Without attempting to recite all of the provisions of these federal enactments, it may be said that upon the filing of a proper petition in a federal district court an attempt at conciliation is provided for the benefit of all parties. In the event of a failure of conciliation, the act provides that the bankruptcy court shall have sole jurisdiction and control of the property involved, and a three-year stay against all other proceedings in all courts, both state and federal, is allowed the petitioner for the purpose of his rehabilitation under the bankruptcy clause of the Constitution, upon the conditions set forth in said act, including the condition that he pay a reasonable rental semiannually for that part of the property of which he retains possession. This legislation is not subject to the "contract clause" of either the state or federal Constitution, and its authorization by the express terms of the federal Constitution was expressly recognized in *Wright v. Vinton Branch of Mountain Trust Bank*, 300 U. S. 440.

It is also well settled that "The paramount power to enact legislation regulating the subject of bankruptcies is conferred by the federal Constitution upon the congress

of the United States. The states are without authority to make or enforce laws which deal with a phase of the subject already covered by federal statutes. Furthermore, a state may not pass or enforce laws to complement a federal bankruptcy act or to provide additional or auxiliary regulations." 6 Am. Jur., Bankruptcy, sec. 3. See, also, *International Shoe Co. v. Pinkus*, 278 U. S. 261, 73 L. Ed. 318.

Therefore, without reference to, or determination of, the effect of the bankruptcy law, as amended in 1935, as a denial of the right of a state to further legislate on matters within its scope, but based solely on the intrinsic nature of the remedy provided thereby, it is clear that a "temporary emergency" created by an impending judicial sale at ruinous judicial sale prices is adequately provided against, and completely terminated. It is equally obvious that the existence of a "temporary emergency" (on the basis of which the moratorium was approved in the *Blaisdell* case, *supra*,) in view of the factual and legislative situation here existing is clearly disproved.

The foregoing is limited in its application to the assignments of errors in the record before us pertaining to the federal Constitution.

This court, in *Bell v. Niemann*, 127 Neb. 762, 257 N. W. 69, having under consideration the validity of the Nebraska moratorium act of 1933, in a case where only federal questions were presented, announced as the controlling rule the following: "The supreme court of the United States is the judicial tribunal of last resort to determine whether a moratory law of a state impairing the obligation of mortgage contracts violates that part of the federal Constitution providing that no state shall pass any law impairing the obligation of contracts, and its negative ruling on that question is binding on the supreme court of Nebraska." However, this court limited the effect of the decision then made by this language (p. 764) : "Whether the Nebraska moratory act violates the Nebraska Constitution is a question not presented to the district court in this case and consequently it is not determinable in the supreme court

on an appeal in the same case, but is left open for future consideration."

In the instant case the record discloses that the validity of the Nebraska moratorium act of 1937 under the provisions of our Nebraska Constitution is for the first time properly presented and now invokes the decision of this court thereon. In this connection it will be remembered that "Decisions of supreme court of United States construing provisions of federal Constitution are not binding on state court in construing similar provisions of state Constitution." *Wilson Banking Co. Liquidating Corporation v. Colvard*, 172 Miss. 804, 161 So. 123.

See, also, *Commonwealth v. Wilkins*, 243 Mass. 356, 138 N. E. 11; *Kennemer v. State*, 154 Ga. 139, 113 S. E. 551; *State v. Pluth*, 157 Minn. 145, 195 N. W. 789; *People v. Mayen*, 188 Cal. 237, 205 Pac. 435; *State v. Chin Gim*, 47 Nev. 431, 224 Pac. 798; *People v. Defore*, 213 App. Div. 643, 211 N. Y. Supp. 134; *Hall v. Commonwealth*, 138 Va. 727, 121 S. E. 154; *People v. Richer*, 127 Misc. Rep. 410, 217 N. Y. Supp. 303; *Alford v. State*, 170 Ala. 178, 54 So. 213; *Rothschild & Co. v. Steger & Sons Piano Mfg. Co.*, 256 Ill. 196, 99 N. E. 920; *Cooper v. Norfolk S. R. Co.*, 161 N. Car. 400, 77 S. E. 339; *Cleveland, etc., R. Co. v. Blind*, 182 Ind. 398, 105 N. E. 483; *Gore v. State*, 24 Okla. Cr. Rep. 394, 218 Pac. 545; *Towle v. Forney*, 14 N. Y. 423; *Lebanon Bank v. Mangan*, 28 Pa. St. 452; *McClure v. Owen*, 26 Ia. 243.

This principle was approved by this court in *Billings v. State*, 109 Neb. 596, 191 N. W. 721. And its affirmance was necessarily involved in the early case of *Franklin v. Kelley*, 2 Neb. 79, wherein we held: "The United States supreme court and the supreme court of this state are peers. The decisions of the former upon the federal Constitution and laws are binding on the latter; the decisions of the latter upon the Constitution and laws of Nebraska are binding on the former."

Unquestionably, this rule is invocable and applicable when the question presented necessitates the consideration of cognate provisions of the state Constitution, some of

which are not embraced in the federal Constitution, and especially so where the Constitutions involved differ essentially in their origin and development. The following constitutes an approved résumé of the accepted principles which govern in the construction of state Constitutions:

"A cardinal rule in dealing with written instruments is that they are to receive an unvarying interpretation, and that their practical construction is to be uniform. A Constitution is not to be made to mean one thing at one time, and another at some subsequent time when the circumstances may have so changed as perhaps to make a different rule in the case seem desirable. A principal share of the benefit expected from written Constitutions would be lost if the rules they established were so flexible as to bend to circumstances or be modified by public opinion. It is with special reference to the varying moods of public opinion, and with a view to putting the fundamentals of government beyond their control, that these instruments are framed; and there can be no such steady and imperceptible change in their rules as inheres in the principles of the common law. Those beneficent maxims of the common law which guard person and property have grown and expanded until they mean vastly more to us than they did to our ancestors, and are more minute, particular, and pervading in their protections; and we may confidently look forward in the future to still further modifications in the direction of improvement. Public sentiment and action effect such changes, and the courts recognize them; but a court or legislature which should allow a change in public sentiment to influence it in giving to a written Constitution a construction not warranted by the intention of its founders, would be justly chargeable with reckless disregard of official oath and public duty; and if its course could become a precedent, these instruments would be of little avail. The violence of public passion is quite as likely to be in the direction of oppression as in any other; and the necessity for bills of rights in our fundamental laws lies mainly in the danger that the legislature will be in-

fluenced, by temporary excitements and passions among the people, to adopt oppressive enactments. What a court is to do, therefore, is *to declare the law as written*, leaving it to the people themselves to make such changes as new circumstances may require. The meaning of the Constitution is fixed when it is adopted, and it is not different at any subsequent time when a court has occasion to pass upon it." 1 Cooley, Constitutional Limitations (8th ed.) 123.

In *Henry v. Cherry & Webb*, 30 R. I. 13, 73 Atl. 97, we find the following: "The court has always held that it is not at liberty to construe into the Constitution new principles which did not exist at the time of its adoption; and when the form of words used in the Constitution is borrowed from an older source, it comes laden with its previous meaning."

In conformity with the principles thus announced, this court is committed to the view that, "In the construction of a Constitution the rule is, 'its terms must be taken in the ordinary and common acceptation, because they are supposed to have been so understood by the framers and by the people who adopted it. This is unquestionably the correct rule of interpretation. It, unlike the acts of our legislature, owes its whole force and authority to its ratification by the people; and they judged it by the meaning apparent on its face according to the general use of the words employed, when they do not appear to have been used in a legal or technical sense.'" *State v. Bacon*, 6 Neb. 286. See, also, *State v. Lancaster County*, 6 Neb. 474; *Hamilton Nat. Bank v. American Loan & Trust Co.*, 66 Neb. 67, 92 N. W. 189; *State v. Lincoln Traction Co.*, 90 Neb. 535, 134 N. W. 278.

A proper application of the foregoing principles supports the conclusion that the meaning of constitutional guaranties does not change, and in the interpretation of the Bill of Rights of our state Constitution the court will consider its history, the development of the evil sought to be restrained by its provisions, the established laws,

usages and customs of the country at the time of its adoption, and the scope of the remedy its terms imply. *State v. Chicago, B. & Q. R. Co.,* 112 Neb. 248, 199 N. W. 534; *State v. McMullen,* 119 Neb. 739, 230 N. W. 677; *Elmen v. State Board of Equalization and Assessment,* 120 Neb. 141, 231 N. W. 772.

If we accept the principles of interpretation here discussed, the controlling issues presented in the instant case are not difficult.

Appellant bases its claim of rights upon sections 13, 16, and 21 of our Bill of Rights. The language of these provisions is clear, the meaning not really in dispute. On this basis appellant challenges the validity of the present Nebraska moratorium law as transgressing its constitutional rights thus defined.

That the Nebraska moratorium act impairs the "obligation of contracts," and is thus embraced within the prohibitions of section 16 of our Bill of Rights, is unquestionably established by the authorities. *Blaisdell v. Home Bldg. & Loan Ass'n,* 189 Minn. 422, 249 N. W. 334; *Travelers Ins. Co. v. Marshall,* 124 Tex. 45, 76 S. W. (2d) 1007; *Home Bldg. & Loan Ass'n v. Blaisdell,* 290 U. S. 398, 78 L. Ed. 413; *Green v. Biddle,* 8 Wheat. (U. S.) 1, 5 L. Ed. 547; *Bronson v. Kinzie,* 1 How. (U. S.) \*311, 11 L. Ed. 143; *Edwards v. Kearzey,* 6 Otto (U. S.) 595, 24 L. Ed. 793; *McCracken v. Hayward,* 2 How. (U. S.) \*608, 11 L. Ed. 397.

This is admitted by appellees, both in their brief and in their argument presented at the bar of this court. Their rejoinder is that the legislature has power to pass laws which impair the obligation of contracts and violate the sections of the state Constitution referred to, and that an economic emergency or crisis is sufficient to call such power into action; that such emergency exists, and thereby the Nebraska moratorium is sustained.

This moratorium, it may be said, is a postponement of fulfilment of obligations enumerated therein, decreed by the state through the medium of the legislature and the

courts. Applying to a restricted class of debtors, it is in its nature essentially special, and in its essence is the application of the sovereign power. The situation is not novel. The principles embodied in section 13 of our Bill of Rights find due acknowledgment and recognition in the provisions of the Magna Charta of 1215. Of the right of every Englishman to apply to the courts of justice for redress of injuries, as early as 1765, Blackstone says:

"Since the law is in England the supreme arbiter of every man's life, liberty, and property, courts of justice must at all times be open to the subject, and the law be duly administered therein. The emphatical words of Magna Charta (c. 29) spoken in the person of the king, who in judgment of law (says Sir Edward Coke, 2 Inst. 55) is ever present and repeating them in all his courts, are these: *nulli vendemus, nulli negabimus, aut differemus rectum vel justitiam*: 'and therefore every subject,' continues the same learned author, 'for injury done to him *in bonis, in terris, vel persona,* by any other subject, be he ecclesiastical or temporal, without any exception, may take his remedy by the course of the law, and have justice and right for the injury done to him, freely without sale, fully without any denial, and speedily without delay.' " 1 Cooley's Blackstone (3d ed.) *141.

These provisions were expressly incorporated into our legislation by the Nebraska territorial act, approved March 16, 1855. They were substantially adopted by the suffrage of the people as section 9, art. I of the Constitution of this state in 1866, and again were readopted by the electorate as section 13, art. I of the Constitution of 1875. *State v. Barney,* 133 Neb. 676, 276 N. W. 676. So, too, the contract clause of section 16 of our Bill of Rights may with equal truth be said, in a historical sense, to evidence the exercise of police power, and to have originated in an economic and financial emergency greater indeed than that from which we are now suffering. On this subject Chief Justice Hughes, in delivering the majority opinion in *Home Bldg. & Loan Ass'n v. Blaisdell, supra,* says, in part:

"But the reasons which led to the adoption of that clause, and of the other prohibitions of section 10 of article I, are not left in doubt and have frequently been described with eloquent emphasis. The widespread distress following the revolutionary period, and the plight of debtors, had called forth in the states an ignoble array of legislative schemes for the defeat of creditors and the invasion of contractual obligations. Legislative interferences had been so numerous and extreme that the confidence essential to prosperous trade had been undermined and the utter destruction of credit was threatened. 'The sober people of America' were convinced that some 'thorough reform' was needed which would 'inspire a general prudence and industry, and give a regular course to the business of society.' The Federalist, No. 44. It was necessary to interpose the restraining power of a central authority in order to secure the foundations even of 'private faith.' The occasion and general purpose of the contract clause are summed up in the terse statement of Chief Justice Marshall in *Ogden v. Saunders,* 12 Wheat. pp. 213, 354, 355: 'The power of changing the relative situation of debtor and creditor, of interfering with contracts, a power which comes home to every man, touches the interest of all, and controls the conduct of every individual in those things which he supposes to be proper for his own exclusive management, had been used to such an excess by the state legislatures, as to break in upon the ordinary intercourse of society, and destroy all confidence between man and man. The mischief had become so great, so alarming, as not only to impair commercial intercourse, and threaten the existence of credit, but to sap the morals of the people, and destroy the sanctity of private faith. To guard against the continuance of the evil was an object of deep interest with all the truly wise, as well as the virtuous, of this great community, and was one of the important benefits expected from a reform of the government.' "

That this brief résumé of the situation is entirely ac-

curate is borne out by all contemporary history, as well as by writers of a later period, as will be seen in the appended note to the decision last above cited.

The times of this period were primitive; people were largely engaged in agriculture, and the transactions involved were confined to classes comparatively few in number. Analysis discloses that the controlling question arising, with which the public mind was then occupied, involved the consummation and performance of contracts, and satisfaction of obligations, involving the payment of money and the enforcement of securities therefor. This limited sphere thus embraced the subjects directly within the contemplation and actual knowledge of those who originally framed the "contract clause" which appears in modern constitutions. Naturally the original framers were not in position to consider new circumstances which could not have been anticipated by them, but which nevertheless may or may not be governed by the general rule which that provision establishes.

Madison briefly epitomized the situation existing during the years immediately prior to the adoption of the federal Constitution, as follows: "Violations of contracts had become familiar in the form of depreciated paper made a legal tender, of property substituted for money, of instalment laws, and of the occlusions of the courts." 3 Beveridge, Life of John Marshall, 558, note.

The language employed by Marshall, as quoted above by Chief Justice Hughes, was addressed to a consideration of the "contract clause" of the federal Constitution. But the fundamental facts on which this decision is based had a wider influence. The inevitable effects upon the prosperity and well-being of the peoples of that period by unlimited and unregulated moratoria interposed in various forms by sovereign power, exercised by the former colonies, which was terminated by the adoption of the federal Constitution, had enlisted a lively interest and continued effort to escape the natural penalties the situation imposed, which long continued to occupy the public mind. This may be

evidenced by the fact that article 2 of Ordinance of July 13, 1787, for the government of the territory of the United States northwest of the Ohio river, enacted by the Continental Congress, provided, in part: "In the just preservation of rights and property, it is understood and declared, that no law ought ever to be made, or have force in the said territory, that shall, in any manner whatever, interfere with, or affect private contracts or engagements, *bona fide*, and without fraud previously formed." 4 Journal of Congress, 1774-1788, p. 753. Further, the Constitution of the Southern Confederacy unanimously formed in 1861 expressly adopted as part thereof the "contract clause" of the federal Constitution. Also, guaranties against the return of the unfortunate situation were incorporated in the Constitutions of each new state as it was formed and admitted into the Union. Thus, the state of Tennessee on February 6, 1796, adopted its state Constitution, under which it was admitted to the Union. Section 4, art. X thereof, reads as follows:

"The declaration of rights hereto annexed, is declared to be a part of the Constitution of this state, and shall never be violated on any pretence whatever. And to guard against transgression of the high powers which we have delegated, we declare, that every thing in the bill of rights contained and every other right not hereby delegated, is excepted out of the general powers of government, and shall forever remain inviolate."

Section 17, art. XI of that Declaration of Rights, embraces the exact words of our own section 13, art. I, save and except it includes (without) "sale," which ours omits.

Section 20 of such art. XI provides: "That no retrospective law, or law impairing the obligation of contracts, shall be made." See I Scott, Laws of Tennessee, 1715-1820.

It is quite evident that the existing powers of legislation by declaration of emergency to assume to exercise police power for the purpose of modifying the effect of constitutional provisions was not contemplated by the

framers of the Tennessee Constitution. Andrew Jackson, subsequently chief justice of the supreme court of Tennessee and President of the United States, was a member of that convention.

This section 17, art. XI of the Constitution of Tennessee, above referred to, came before the supreme court of that state in *Fisher's Negroes v. Dabbs*, 6 Yerg. (Tenn.) 119. Without detailing the facts and issues, it may be said, a unanimous court, that lived with slavery, believed in the institution as such, and naturally possessed the prejudices that the situation created, held the constitutional provision applied to slaves for the lawful protection of their rights against the terms of an act of the legislature in contravention thereof.

In 1821 the "contract" and "open court" clauses were construed by the Tennessee supreme court in *Townsend v. Townsend*, Peck (Tenn.) 1. The case grows out of the attempt of the legislature to deal with the national economic and financial depression of 1819, which included the application of a two-year stay to antecedent contracts. The Tennessee court held the principles controlling to be, in substance: "The legislature may alter remedies; but they must not, so far as regards antecedent contracts, be rendered less efficacious or more dilatory than those ordained by the law in being when the contract was made, if such alteration be the direct and special object of the legislature, apparent in an act made for the purpose." Hence, an act to suspend execution for two years unless the plaintiff would indorse thereon that he would receive bank paper in discharge of his judgment was repugnant to the clauses of the Constitution now under consideration. Haywood, J., in delivering this opinion in the *Townsend* case, says, in part:

"Our state Constitution, art. 11, sec. 7, ordains 'that all courts shall be open, and every man for an injury done him in his lands, goods, person, or reputation, shall have remedy by course of law, and right and justice administered without sale, denial, or delay.' This clause relates

to every possible injury which a man may sustain and which affects him in respect to his real or personal property, or in respect to his person or reputation, and includes the right which is vested in him to demand the execution of a contract; which being a personal right to a chattel is, when performance is denied or withheld, an injury to him in his goods or chattels. And with respect to it right and justice is to be done, without sale, denial, or delay. In Magna Charta this restriction is upon royal power; in our country it is upon legislative and all other power. We must understand the meaning to be that, notwithstanding any act of the legislature to the contrary, every man shall have 'right and justice' in all cases, 'without sale, denial, or delay.'"

In like manner, Ohio was admitted into the federal Union under a state Constitution adopted in 1802. In part, it reads as follows: "That the general, great, and essential principles of liberty and free government may be recognized and forever unalterably established, we declare:" In section 7, art. VIII thereof, we find our own section 13 verbatim, and in section 16 a provision that "no *ex post facto* law, nor any law impairing the validity of contracts, shall ever be made," etc. Section 28 is: "To guard against the transgressions of the high powers, which we have delegated, we declare, that all powers not hereby delegated, shall remain with the people." See 1 Chase, Statutes of Ohio, 1788-1833.

The following provisions of our own Constitution are of importance in this instant case, viz.:

"We, the people, grateful to Almighty God for our freedom, do ordain and establish the following declaration of rights and frame of government, as the Constitution of the state of Nebraska."

Section 13, art. I, provides: "All courts shall be open, and every person, for any injury done him in his lands, goods, person, or reputation, shall have a remedy by due course of law, and justice administered without denial or delay."

Section 16, art. I, is as follows: "No bill of attainder, *ex post facto* law, or law impairing the obligation of contracts, or making any irrevocable grant of special privileges or immunities shall be passed."

Section 21, art. I, recites: "The property of no person shall be taken or damaged for public use without just compensation therefor."

Section 26, art. I, is: "This enumeration of rights shall not be construed to impair or deny others, retained by the people, and all powers not herein delegated, remain with the people."

The adoption of each of the state Constitutions above referred to was not an isolated event. The substantial identity of the language employed, as well as the records and aspirations of the peoples who thus acted, evidence a historical connection and establish the unanimity of purpose and intent of those concerned.

The situation invokes the application of the rule that, in the absence of expressed contrary intention, the adoption of a statutory or constitutional provision from another state accepts the meaning of such adopted provision that it carried in the context of which it originally formed a part and, if it had been previously construed by the courts of such state, the judicial determination thus made. *Goble v. Simeral,* 67 Neb. 276, 93 N. W. 235; *Medow v. Riggert,* 132 Neb. 429, 272 N. W. 238; *Becker County Sand & Gravel Co. v. Wosick,* 62 N. Dak. 740, 245 N. W. 454; *In re Hammond,* 83 Neb. 636, 120 N. W. 203; *State v. McMullen,* 119 Neb. 739, 230 N. W. 677. Thus, the principles of construction declared by the courts of Tennessee in 1821 in *Townsend v. Townsend, supra,* become an approved precedent for the courts of Nebraska.

It appears that the precedents in this jurisdiction, both in the interpretation of the "contract clause" and the "open court" requirement of the state Constitution, while not always referring to this authority, have substantially conformed to the doctrine announced therein. *American Bldg. & Loan Ass'n v. Rainbolt,* 48 Neb. 434, 67 N. W. 493;

*Kearney County v. Taylor*, 54 Neb. 542, 74 N. W. 965; *Hessen Siak Shams v. Nebraska State Bank*, 48 Fed. (2d) 894; *Travelers Ins. Co. v. Ohler*, 119 Neb. 121, 227 N. W. 449; *Douglas County v. Vinsonhaler*, 82 Neb. 810, 118 N. W. 1058; *Fitch v. Martin*, 80 Neb. 60, 113 N. W. 796; *Burnham v. Bennison*, 121 Neb. 291, 236 N. W. 745; *Rentschler v. Missouri P. R. Co.*, 126 Neb. 493, 253 N. W. 694; *Wilfong v. Omaha & C. B. Street R. Co.*, 129 Neb. 600, 262 N. W. 537.

It will also be noted that the doctrine of the *Townsend* case is in harmony with the principles announced by the supreme court of the United States, in a series of well-considered cases, whose soundness had gone unchallenged for more than seventy-five years. *Bronson v. Kinzie*, 1 How. (U. S.) *311, 11 L. Ed. 143; *McCracken v. Hayward*, 2 How. (U. S.) *608, 11 L. Ed. 397; *Gantly's Lessee v. Ewing*, 3 How. (U. S.) 707, 11 L. Ed. 794; *Howard v. Bugbee*, 24 How. (U. S.) 461, 16 L. Ed. 753; *Gunn v. Barry*, 15 Wall. (U. S.) 610, 21 L. Ed. 212; *Walker v. Whitehead*, 16 Wall. (U. S.) 314, 21 L. Ed. 357; *Edwards v. Kearzey*, 96 U. S. 595, 24 L. Ed. 793; *Barnitz v. Beverly*, 163 U. S. 118, 41 L. Ed. 93; *Bradley v. Lightcap*, 195 U. S. 1, 49 L. Ed. 65.

Then, too, it must be conceded that in adopting sections 9 and 12, art. I of the Nebraska Constitution in 1866, and their readoption in 1875 (as sections 13 and 16, art. I) by the electorate of the state, the settled judicial interpretation of these clauses was also adopted. *Stein v. Morrison*, 9 Idaho, 426, 75 Pac. 246; *State v. Henry*, 37 N. M. 536, 25 Pac. (2d) 204; *State v. Sullivan*, 283 Mo. 546, 224 S. W. 327; *Morgan v. State*, 51 Neb. 672, 71 N. W. 788; *Travelers Ins. Co. v. Marshall*, 124 Tex. 45, 76 S. W. (2d) 1007.

The meaning of a Constitution is fixed when it is adopted, and it is not different at any subsequent time when a court has occasion to pass upon it. The theory of our political system is that the ultimate sovereignty is in the people, from whom all legitimate authority springs. Therefore, all power of government in this republic is vested

in the people in their collective capacity, the electorate. They collectively, acting through the medium of Constitutions, create such governmental agencies, endow them with such powers, and subject them to such limitations as in their wisdom will best promote the common good. With reference to the governmental agencies so created by them, the fundamental power to grant, the power to license, and the power to reserve, exercisable by the people, are coequal. A limitation, a reservation, and a grant, expressed in the terms of a Constitution, are equally the exercise of the sovereign power. Nor can these fundamental principles be modified or in any manner controlled by the invocation by a state governmental agency of the doctrine of police power, if the power it seeks to exercise it has not in fact received, and is in any manner inconsistent with the express terms of the state Constitution. For section 26 of our Bill of Rights, in clear and unmistakable language, provides: "All powers not herein delegated, remain with the people."

Indeed, the so-called state police power is not an entity. Its actual essentials are not of recent origin. It is not a power mysteriously nebulous, a separate or a distinct manifestation of governmental authority. It is not superior to state Constitutions so that it may properly be said that, though an act of a governmental agency may be unconstitutional, still it may be justified under the police power, as though the same police power were a divinely mysterious governmental attribute of superior rank to the Constitution itself. As a term of legal nomenclature, it appears that it was originally introduced by Chief Justice Marshall to identify a legal concept which was subsequently referred to by the supreme court of the United States as no more nor less than the powers of government inherent in every sovereignty to the extent of its dominions,—the power to govern men and things. And so far as emergency by the exercise of police power authorizing what otherwise would be opposed to constitutional provisions, the answer of precedents is: "Emergency does not create

power. Emergency does not increase granted power or remove or diminish the restrictions imposed upon power granted or reserved. The Constitution was adopted in a period of grave emergency. Its grants of power to the federal government and its limitations of the power of the states were determined in the light of emergency and they are not altered by emergency." *Home Bldg. & Loan Ass'n v. Blaisdell, supra.*

Sections 13, 16, and 26, art. I of our Constitution, are definite limitations on the power of the legislature, and invalidate all legislative action that exceeds the limitation they define or impairs the exercise of the powers they declare. The true meaning of the text of these articles of our Bill of Rights remains as it was when they were adopted.

The identical language (now appearing as sections 13 and 16, art. I of our Constitution), in 1821, in the courts of Tennessee, invalidated the efforts of the legislature of that state attempting to impair the obligations of contracts previously made, by attaching thereto a two-year stay; and likewise, in 1834, in the same courts, it secured just protection of the rights of slaves to have justice administered without denial or delay, by striking down legislation designed to deny to them the remedy of open courts. Furthermore, in our own times, this same language was sustained by this court as requiring that justice be administered as provided by its terms (*Burnham v. Bennison, supra*) ; and as a guarantee to the wage earner of a prompt hearing in a court of competent jurisdiction with such recompense as his just rights entitled him (*Rentschler v. Missouri P. R. Co., supra*).

Thus, these provisions (sections 13 and 16, art. I of the Nebraska Constitution), whose origin antedates the days of King John of England, still retain their original virility, and constitute present binding limitations on the exercise of governmental powers, legislative, executive or judicial, which "emergency" may not impair, destroy or modify.

Therefore, the conclusion is inescapable that the Nebraska moratorium law, as amended in 1937 (a six-year act), contravenes the spirit and express terms of sections 13 and 16, art. I of our Constitution, and is wholly invalidated thereby.

It follows that the trial court erred in the judgment entered in the instant case, and such judgment is reversed and the cause remanded for further proceedings in harmony with this opinion.

REVERSED.

PAINE, J., dissenting.

As the opinion adopted by the majority of the court does not express my views, I am filing this dissent.

I will state the facts of the case briefly. Smith borrowed $8,000 of the First Trust Company of Lincoln on May 1, 1929, at 6 per cent. interest. He finally paid off down to $3,000 of the principal, and the time was extended on the balance. Foreclosure proceedings were started February 9, 1934, upon his failure to pay interest and taxes, and a decree was promptly entered on April 12, 1934, finding the amount due on the mortgage of $3,354.38, with interest at 10 per cent. First the regular nine months' stay was granted, and later a moratorium stay, which allows Smith to remain in possession of the property upon the payment of $50 a month rent. There is in this case a large equity, for it is stipulated that the value of the mortgaged property is between $8,500 and $12,000.

This case brings to this court the question whether the Nebraska moratorium law is a valid law. The decision with which I do not agree is based on the finding that "the factual and legislative situation existing on the 16th day of February, 1937, *and since continuing*" is insufficient to constitute a temporary emergency.

This moratorium law, as found in Legislative Act No. 4, passed by the legislature of 1937, provided in section 1, in substance, that there is an economic crisis, world-wide in extent; that Nebraska experienced an unexpected drouth, that part of the state suffered from insect pests; all of

which taken together resulted in a practical total loss of the 1936 crop, and threatened a collapse of real estate values in the state; that such a condition was dangerous to the general welfare and prosperity of the state of Nebraska and its people. The act then provided in substance that, after a decree of foreclosure is rendered, if good cause is shown, the court may leave the owner in possession, providing he pays a fair rental, income, or profit to the clerk of the district court for the mortgagee, and further providing for taxes, interest, and upkeep. It provides that this moratorium law expires at midnight March 1, 1939.

The decision which I do not support holds that this law contravenes the spirit and express terms of two sections of the Bill of Rights, to wit, sections 13 and 16, art. I of the Constitution. Section 13 reads: "All courts shall be open, and every person, for any injury done him in his lands, goods, person, or reputation, shall have a remedy by due course of law, and justice administered without denial or delay." And section 16 reads: "No bill of attainder, *ex post facto* law, or law impairing the obligation of contracts, or making any irrevocable grant of special privileges or immunities shall be passed."

It may be frankly admitted that this moratorium law may cause a little delay before the owner can be deprived of the possession of his property. But, in some states, a stay of 18 months, instead of nine months as in Nebraska, is allowed before confirmation of the foreclosure sale, and such longer delays have been upheld by the courts.

When the question of the validity of such a moratorium law came before the United States supreme court in the famous *Blaisdell* case from Minnesota (290 U. S. 398) Chief Justice Hughes, in writing the opinion, adopted by the court, upholding the right of the legislature of Minnesota to enact a moratorium law similar to our Nebraska law, embodied in his opinion this statement:

"But into all contracts, whether made between states and individuals, or between individuals only, there enter con-

ditions which arise not out of the literal terms of the contract itself; they are superinduced by the preexisting and higher authority of the laws of nature, of nations or of the community to which the parties belong; they are always presumed, and must be presumed, to be known and recognized by all, are binding upon all, and need never, therefore, be carried into express stipulation, for this could add nothing to their force. Every contract is made in subordination to them, and must yield to their control, as conditions inherent and paramount, wherever a necessity for their execution shall occur."

One of the conditions to which a contract must yield is that of a great emergency, sufficient to warrant the legislature in passing a special act for the general welfare of all the people, in which case the exact terms of a contract between individuals may be slightly modified. When this moratorium act was pending before our legislature, it is stated in the brief of the appellee that, "After it was referred to the judiciary committee, public hearings were had before that committee on several occasions. At such hearings many prominent persons, interested on one side or the other, appeared, and the measure was discussed pro and con and from every possible angle and viewpoint." It was then decided by the Nebraska legislature that such an emergency existed as justified the legislature in passing this law.

May we glance at the conditions generally, and especially in Nebraska as of a year ago, when the law was enacted, as well as conditions "since continuing."

The United States weather bureau published a report stating that not since 1930 has Nebraska received the normal average rainfall of 22.66 inches; that the average for 1936 was 14.42 inches, and for 1937 it was 17.76 inches, and that one Nebraska station reported the lowest rainfall in 50 years.

Dr. H. Clyde Filley, economist of the Nebraska College of Agriculture at Lincoln, recently gave out the statement: "The outlook today on the farms of Nebraska is the *worst*

*it has been for a generation.* Over more than one-half of the state there is practically no moisture in the subsoil within five or six feet of the surface. The exceptions to this are along the Missouri river, in the other river valleys, in the irrigated districts and in a few counties in northeastern Nebraska. Last year there was only about one-third of a corn crop; on more than a third of the farms of Nebraska there are at this time no hogs at all, in fact there are the fewest hogs in Nebraska for many years. The majority of the farmers are finding it necessary to buy corn, or other concentrates, for there is practically no reserve grain on the farms this year."

It is common knowledge that land values in Nebraska have shrunk enormously; that whole townships of grazing land in the cattle country have changed hands at prices of a dollar to three dollars an acre; that farms in tested irrigation districts in the Platte valley have sold far below their cost. In a recent instance, the owner of a fine piece of irrigated beet land, with no improvements, had finally invested $210 an acre before the ditch bonds were paid off. She tried for two years to effect a sale by every means at hand, and finally sold the land on long-time payments, at low interest, for $75 an acre; and many such cases are known to all.

As I set out on page 456 of my dissent in *Steinacher v. Swanson,* 131 Neb. 439, 268 N. W. 317, there was a total of 225,273 tracts of real estate advertised by the 93 county treasurers of Nebraska for public sale for the delinquent taxes, amounting to over $46,000,000 in the fall of 1935. The present tax situation is very much worse, for no outside buyers can now be found except in isolated instances, and many Nebraska counties and cities are at the present time bringing blanket foreclosure suits to realize something on such delinquent taxes. Has such a condition ever existed in Nebraska before?

Nebraska is also greatly affected by general conditions because serious business declines are still under way, although there has already been a loss in the values of the

stocks listed on Wall street in the last eight months of more than thirty billion dollars, according to a leading financial journal. In a statement of J. J. Pelly, head of the Association of American Railroads, he declares that the railroads are in a critical financial condition, suffering reduced tonnage, declining revenues with rising wages, higher taxes, and increased costs of everything they have to buy. These facts make the future value of all railroad securities most uncertain.

In the Business Bulletin of the Cleveland Trust Company for February 15, 1938, Colonel Leonard P. Ayers, the famous statistician, in referring to the present recession, which began in August, 1937, says:

"The federal reserve index of the volume of industrial production dropped from 117 in August to 84 in December, or 33 points in four months. At the beginning of the great depression in 1929 and 1930 the same index moved downward for 13 months before it had lost 33 points, instead of doing it in four months as it did this time."

He then tells us that only three business declines in the last 100 years have been comparable to this abrupt depression, for this rapid decline has been exceeded but once, i. e., in the panic of 1893, and has only been approached twice, which was in the panics of 1907 and 1920. He then positively states: "Business confidence has suffered a more rapid decline since last spring than in any recent previous period of similar duration."

Such well-established facts should not be overlooked by this court, and they prove that this present moratorium law of Nebraska which we are considering is justified when it takes effect at a time of such a rapid decline in business as to have been only equaled once in the last 100 years, which amply supports the declaration of the legislature that this is such an emergency as warrants the enactment of this moratorium law.

In Nebraska, as a result of numerous foreclosures, life insurance companies and trust companies, as well as the trust funds of estates and colleges, are all becoming loaded

up with farms taken in exchange for real estate mortgages, and which they are not prepared to profitably operate. In fact, in many cases they find the former owner is the best possible person to manage the farm they have taken over. Why is it declared to be violative of our Bill of Rights for the legislature to permit an extension of time before the mortgagee gets possession of the farm? For, as a rule, such a mortgagee does not want the farm itself, but only wants the money and interest due on the loan secured by the farm.

The effect of economic and financial distress is widespread, and to show that Nebraska is not standing alone in seeking in this dire emergency to afford some slight relief by means of a legitimate moratorium law, I find that in 1934, in an article in 2 George Washington Law Review, 487, it is said that by 1934 the following 25 states had enacted moratorium laws to meet the emergencies existing in the respective states: Arizona, Arkansas, California, Idaho, Illinois, Iowa, Kansas, Michigan, Minnesota, Montana, Nebraska, New Hampshire, New Jersey, New York, North Carolina, North Dakota, Ohio, Oklahoma, Pennsylvania, South Carolina, South Dakota, Texas, Vermont, West Virginia, and Wisconsin. During the last four years many more states have been added to this list, and such moratorium laws have been repeatedly upheld by the decisions of courts of last resort.

In entire disregard of the actual facts of the present widespread agricultural and financial distress, this moratorium law is declared unconstitutional, on the ground that it is based upon an emergency, without the facts necessary to uphold it, and on the further ground that a vital mistake was made by the legislature in setting out the declaration upon which it is founded. In my humble opinion, the legislature of Nebraska was exceedingly careful to rather understate the actual conditions as they existed a year ago, which conditions have grown worse so rapidly that the present business decline has only been equaled once in the last 100 years; so, whatever may have

been thought of the unfortunate situation which existed four years ago and two years ago, the present financial and agricultural collapse is so much more intense as proves it now to be the great emergency which fully justifies the present moratorium law under the careful pronouncement of Chief Justice Hughes in the *Blaisdell* case.

It is admitted by all who have studied the situation that business will not be good in Nebraska until we have at least one good crop, for Nebraska is primarily an agricultural state, and cannot have good times unless the farmers are prosperous.

In 6 R. C. L. 97, sec. 98, it is said that all the presumptions are in favor of the constitutionality of a statute, and if there is doubt it must be decided in favor of its validity, for each intendment is in favor of its constitutionality, unless the contrary is made to appear *beyond a reasonable doubt.* And in section 100: "It has been said that the courts should not conjure up theories to overturn and overthrow the solemn declarations of the legislative body."

In chapter 7, Cooley, Constitutional Limitations (6th ed.), 219, it is said: "Before proceeding to annul, by judicial sentence, what has been enacted by the law-making power, it should clearly appear that the act cannot be supported by any reasonable intendment or allowable presumption."

In the opinion of Judge Pound in *People v. LaFetra,* 230 N. Y. 429, 130 N. E. 601, it is said: "Whether or not a public emergency existed was a question of fact, debated and debatable, which addressed itself primarily to the legislature. That it existed; promised not to be presently self-curative, and called for action, appeared from public documents and from common knowledge and observation. If the law-making power on such evidence has determined the existence of the emergency and has, in the main, dealt with it in a manner permitted by the constitutional limitations upon legislative power, so far as same affect the class of landlords now challenging the statutes, the legislation should be upheld."

Judge Pound also held in the same case: "Emergency laws in time of peace are uncommon but not unknown. Wholesale disaster, financial panic, the aftermath of war, * * * earthquake, pestilence, famine and fire, a combination of men or the force of circumstances may, as the alternative of confusion or chaos, demand the enactment of laws that would be thought arbitrary under normal conditions. * * * Although emergency cannot become the source of power, and although the Constitution cannot be suspended in any complication of peace or war, * * * an emergency may afford a reason for putting forth a latent governmental power already enjoyed but not previously exercised."

These statements were made by Judge Pound in holding constitutional a statute suspending for two years in the city of New York possessory remedies to regain possession of real property.

"In construing an act of the general assembly, such a construction will be placed upon it as will tend to advance the beneficial purposes manifestly within the contemplation of the general assembly at the time of its passage; and courts will hesitate to place such a construction upon its terms as will lead to manifestly absurd consequences, and impute to the general assembly total ignorance of the subject with which it undertook to deal." *Brewster v. Wooldridge*, 100 Ga. 305, 28 S. E. 43, cited in 2 Lewis' Sutherland, Statutory Construction, 913, sec. 490.

This court has afforded relief to the owners of Nebraska mortgages in almost every instance when it was proved that the value of the land was less than the amount of the mortgage debt standing against it. *Clark v. Hass*, 129 Neb. 112, 260 N. W. 792; *First Trust Co. v. Stenger*, 130 Neb. 750, 266 N. W. 642; *Srajhans v. Mares*, 130 Neb. 924, 267 N. W. 82; *State Life Ins. Co. v. Heffner*, 131 Neb. 700, 269 N. W. 629; *Keller v. Griffith*, 132 Neb. 393, 272 N. W. 203; as well as many others.

In a case brought by this same appellant, it was said such postponement by a moratorium was not intended to

enable the debtor to realize some speculative value out of the real estate or to delay indefinitely the day of reckoning. *First Trust Co. v. Airdale Ranch & Cattle Co.*, 131 Neb. 475, 268 N. W. 362. It would follow that one who has simply purchased an equity of redemption would be denied any delay under moratorium, and the mortgagee would promptly receive his confirmation.

Even in a case after a moratorium had been granted, and it was found that the mortgage debt amounted to $160,446.39 and the real estate had only a value of $100,000, it was held by this court that moratorium stays are at all times under the control of the court, and may be reexamined, and, upon good cause being shown, may be modified or vacated. *Security Mutual Life Ins. Co. v. Herpolsheimer Bldg. Co.*, 132 Neb. 149, 271 N. W. 343.

The holdings of this court have in the past been uniform that a moratorium stay is not granted to every one as a matter of right, but is only available to those who can show an equity in their land, as was recognized by Judge Donohoe, of the United States district court for Nebraska, in *Union Central Life Ins. Co. v. Hoffman*, 18 Fed. Supp. 830, in which he added: "This is a matter, not of private concern, but of great public interest." And further said: "The mortgagor is familiar with the property, and presumably vitally interested in preserving ownership thereof and ready to exert himself to the uttermost to that end."

The First Trust Company might have been delayed for a few months by this moratorium stay if it had not been held invalid, but its decree is for $3,354.38, drawing 10 per cent. interest, with $50 a month rent in the meantime, and it is stipulated that its security in this case is worth from $8,500 to $12,000. I fail to see how appellant could have been injured in any way by abiding by the law passed by the legislature.

The right of a state to exercise its power to give temporary relief, when urgent public distress has been brought about by six years of drouths, insect pests, and economic and financial depression, is not, in the opinion of many

state and federal judges, such an abuse of the power of sovereignty that a carefully considered moratorium law, of the same general character as enacted by many other states from the Atlantic to the Pacific, should be struck down by the court as an unwarranted act of the legislature.

In my opinion, this moratorium law was proper emergency legislation, fully justified by the conditions set out, and it has prevented, up to this time, widespread evictions of distressed farmers and homeowners, who have in many cases by this beneficial law been able to save their homes, as the legislature wisely provided.

CARTER, J., concurring separately.

I concur fully with the majority opinion in this case, but, in view of the contents of the dissenting opinion subsequently filed, I deem it necessary to express my views with reference thereto.

The question involved in this case is whether the Nebraska moratorium law of 1937 is repugnant to section 16, art. I of the Constitution of this state, providing that "no bill of attainder, *ex post facto* law, or law impairing the obligation of contracts, or making any irrevocable grant of special privileges or immunities shall be passed."

The provision of the Constitution that no law impairing the obligation of contracts shall be passed does not admit of more than one interpretation. If this provision meant, at the time it was adopted, that the terms of a contract for the payment of money could not be altered by a state statute for the relief of unfortunate debtors by postponing payment or enforcement during an economic or financial emergency, obviously it means the same now. The majority opinion in this case demonstrates that it was the intent of the people of this state when they adopted their Constitution, and continuing up to the present time, to prohibit the passage of such a law. They did not say that such legislation was prohibited *except in case of dire stress and extreme emergency*. The passage of such a law was prohibited by the supreme law of this state under all conditions and under all circumstances.

The language of the provision is plain and concise. The writer of the dissenting opinion says that courts, in construing a statute, "will hesitate to place such a construction upon its terms as will lead to manifestly absurd consequences, and impute to the general assembly total ignorance of the subject with which it undertook to deal." I have no fault to find with this statement of the law, but, in applying the same rule to the constitutional provision under consideration, I say that we as a court cannot impute to the people of this state total ignorance of the subject with which they were dealing when they included this clause in the Constitution, especially when it was included with full knowledge of the interpretation that had been placed upon it by many courts at that time.

In the famous case of *Ex parte Milligan,* 4 Wall. (U. S.) 2, Mr. Justice Davis ably stated the law, in a case in which it was argued that a grave emergency, the Civil War, gave rise to the exercise of power to deprive a citizen charged with crime of a right to a jury trial, in the following words: "Time has proved the discernment of our ancestors; for even these provisions, expressed in such plain English words, that it would seem the ingenuity of man could not evade them, are now, after the lapse of more than seventy years, sought to be avoided. Those great and good men foresaw that troublous times would arise, when rulers and people would become restive under restraint, and seek by sharp and decisive measures to accomplish ends deemed just and proper; and that the principles of constitutional liberty would be in peril, unless established by irrepealable law. The history of the world had taught them that what was done in the past might be attempted in the future. The Constitution of the United States is a law for rulers and people, equally in war and in peace, and covers with the shield of its protection all classes of men, at all times, and under all circumstances. No doctrine, involving more pernicious consequences, was ever invented by the wit of man than that any of its provisions can be suspended during any of the great exigen-

cies of government. Such a doctrine leads directly to anarchy or despotism, but the theory of necessity on which it is based is false; for the government, within the Constitution, has all the powers granted to it, which are necessary to preserve its existence; as has been happily proved by the result of the great effort to throw off its just authority."

In *Dred Scott v. Sandford,* 19 How. (U. S.) 393, Chief Justice Taney said that, while the Constitution remains unaltered, it must be construed now as it was understood at the time of its adoption; that it is not only the same in words but the same in meaning, "and as long as it continues to exist in its present form, it speaks not only in the same words, but with the same meaning and intent with which it spoke when it came from the hands of its framers, and was voted on and adopted by the people of the United States. Any other rule of construction would abrogate the judicial character of this court, *and make it the mere reflex of the popular opinion or passion of the day.*" (Italics ours.)

In the case of *People v. Blodgett,* 13 Mich. 127, the court said:

"But it may easily happen that specific provisions may, in unforeseen emergencies, turn out to have been inexpedient. This does not make these provisions any less binding. Constitutions cannot be changed by events alone. They remain binding as the acts of the people in their sovereign capacity, as the framers of government, until they are amended or abrogated by the action prescribed by the authority which created them. It is not competent for any department of the government to change a Constitution, or declare it changed, simply because it appears ill adapted to a new state of things. * * *

"Restrictions have, it is true, been found more likely than grants to be unsuited to unforeseen circumstances. * * * But, where evils arise from the application of such regulations, their force cannot be denied or evaded; and the remedy consists in repeal or amendment, and not in false constructions."

In *Steinacher v. Swanson*, 131 Neb. 439, 268 N. W. 317, we quoted with approval the following language from the case of *State v. Fischl*, 94 Mont. 92, 20 Pac. (2d) 1057: "It must be remembered that the provisions of the Constitution are mandatory and prohibitory unless otherwise expressed, and these provisions read the same whether in fair weather or in foul. The proposition that an emergency justifies a removal of constitutional safeguards is an egregious fallacy. A safeguard once let down inevitably must lead to mischief. If one be let down, why not another? 'And many an error, by the same example, will rush into the state.' Our duty is clear. Each of us upon assuming office took an oath 'to support, protect, and defend the Constitution of the state of Montana,' and from this obligation we shall not shrink."

If we arbitrarily disregard the constitutional provision prohibiting the passage of a law impairing the obligation of contracts, on the ground that an emergency exists, or for any other reason, what will we do when the freedom of the press is interfered with by legislative enactment? What will the result then be when free speech, freedom of religion, the right to trial by jury, and our other constitutional guaranties are interfered with? Will it be a sufficient answer to say that such interference is justified because the legislature in its wisdom has declared that an emergency exists? Such an argument is not only unsound from a legal standpoint, but it rocks the very foundation of our constitutional form of government.

The writer of the dissenting opinion bases his whole contention on the theory that an emergency exists. He frankly concedes that the contract in question was impaired, but that emergent conditions justify constitutional violation. As has been many times said, "Emergency does not create power, but it may authorize the use of power." But how can it authorize the use of power that is plainly and clearly prohibited by constitutional provision? There can be but one answer unless we assume that there is an inherent power in government that transcends all consti-

tutional authority. And if such power exists, why should we have a Constitution? If a declaration and proof of an emergency can break the restraining chains of the Constitution, why have a Constitution? If the government created by the sovereign people may become superior to its creators, our hopes of a free constitutional government rest only upon the natural restraints of the persons whom we invest with authority.

The writer of the dissenting opinion devotes much space in showing that our economic and financial condition is very bad and that it constitutes a grave emergency. I fully agree that our economic and financial situation is for all practical purposes as bad as it has been outlined. But such a situation is not limited in effect to mortgagors who mortgaged their lands prior to March 1, 1934. What of those persons who have mortgaged their properties since that date and who are entitled to no relief under this act? The conditions noted are so far reaching as to affect mortgagees as well as mortgagors. Why should frugal persons who have saved and invested in farm mortgages expecting to live off the income in their declining years be required to suffer in order that a mortgagor who has breached his contract may have a respite? Why should those persons who have purchased bonds secured by real estate suffer additional hardships in order that one who has violated his contract to pay a just debt should retain both the borrowed money and the security? What rule of fairness requires those dependent upon the income from farm mortgages, including widows, orphans, beneficiaries of trusts and wards of guardians, to give up, not only their income, but the principal as well, in order that a mortgagor may have additional time to save an investment that did not prove to be sound? I fully agree that mortgagors have suffered by conditions as they now exist, but I fail to find any rule of law or reason advanced in the dissenting opinion that warrants protection to one class at the expense of all the others affected thereby.

I necessarily conclude that the prohibition against the

impairment of contracts by the legislature is so clear that it is only by an unwarranted judicial distortion of its plain provisions that the moratory law could be upheld. The meaning of the constitutional provision is so clear that it is not subject to construction. The idea that an existing emergency could change its meaning is clearly disproved by a reading of the simple language contained in the provision itself. The holdings of our court in the past have been consistent with the majority opinion.